Jimmy HOWLETT, Appellant,

v.

The STATE of Texas.

No. 881–97.

Court of Criminal Appeals of Texas.

June 9, 1999.

---

Ed Paynter, Abilene, for appellant.

Kollin Shadle, Asst. Dist. Atty., Abilene, Matthew Paul, State's Atty., Austin, for State.

## *O P I N I O N*

HOLLAND, J., delivered the opinion of the Court, in which McCORMICK, P.J., MANSFIELD, KELLER, PRICE, WOMACK, and KEASLER, JJ., joined.

A jury found appellant, Jimmy Howlett, guilty of criminal mischief. TEX. PENAL CODE ANN. § 28.03(a)(2). The trial court assessed punishment at a $500 fine and four years confinement, but suspended imposition of the sentence and placed appellant on community supervision for four years. On appeal, the conviction was reversed and the case remanded for a new trial. *Howlett v. State*, 946 S.W.2d 870 (Tex.App.—Eastland 1997). We granted the State's petition for discretionary review to determine whether the Court of Appeals erred in holding the trial court's failure to submit a requested jury instruction on limitations was error.[1]

## I.

On August 12, 1993, a Lone Star Gas Company construction crew discovered an unauthorized tap connected to the inlet riser of the gas meter while repairing a leak in a main gas line in the alley behind appellant's residence. The tap consisted of a saddle valve in the side of the service line which diverted gas before it went through the metering device. The saddle valve was in the "on" position and gas was flowing out of the line and into the valve. Further investigation uncovered copper tubing buried on appellant's property which led to appellant's garage. There was copper tubing sticking out of the baseboard in appellant's garage that was unconnected, but the ends of the tubing appeared to have been recently cut, and the threads on two nearby gas heaters suggested that they recently had been disconnected from the copper tubing.

Appellant was subsequently charged with criminal mischief. The indictment alleged he intentionally and knowingly tampered with the tangible property of the Lone Star Gas Company resulting in pecuniary loss and substantial inconvenience to the owner on or about August 5, 1993. TEX. PENAL CODE ANN. 28.03(a)(2).[2] Specifi-

---

1. In its two grounds for review, the State asks this Court to address: (1) whether the defensive issue of limitations may be raised by evidence outside the presence of the jury; and (2) whether a finding of a continuing offense obviates a limitations instruction absent evidence before the jury showing termination of the offense.

2. Article 28.03 provides in relevant part:

cally, appellant was charged with the installation of an unauthorized tap which diverted gas before it went through the meter. TEX. PENAL CODE ANN. 28.03(c)(2)-(3). Appellant filed an application for a pre-trial writ of habeas corpus alleging the statute of limitations had run. The basis for the application was that undisputed testimony established that if the offense occurred it occurred "sometime around the year 1985 when the tap was installed" which was outside the applicable limitations period.[3] TEX.CODE CRIM. PRO. ANN. art. 12.01(6). After conducting a hearing, the trial court denied the writ application.

The Eastland Court of Appeals affirmed. *Ex parte Howlett*, 900 S.W.2d 937 (Tex. App.—Eastland 1995, pet. ref'd). The question on appeal was "when does the statute of limitations commence to run for the offense of criminal mischief by the unauthorized diversion of natural gas: at the time the unauthorized tap is first installed or at a later date when it causes pecuniary loss to the owner?" *Id.* at 938. The Court of Appeals determined that, under the facts of the case, the offense was a "continuing" offense that was "being committed as long as the tap [was] installed and gas [was] being diverted, causing loss to the owner." *Id.* Overruling appellant's sole point of error, the Court of Appeals held "limitations could be calculated from August 5, 1993, the date alleged in the indictment." *Id.*

At the guilt/innocence portion of trial, appellant requested a jury instruction on the statute of limitations. The trial court denied appellant's request. On appeal appellant claimed the trial court's failure to give the limitations instruction was error. *Howlett*, 946 S.W.2d at 875. The State claimed the Court of Appeals had resolved the limitations issue in the habeas corpus appeal, and thus, consideration of this issue was foreclosed pursuant to the doctrine of "law of the case."

The Court of Appeals disagreed. The court observed that "the issue of limitations [could] be raised as a challenge to the indictment (question of law) or as a challenge to the sufficiency of the evidence (question of proof)." *See Howlett*, 946 S.W.2d at 874, 875. The court concluded that appellant's challenge to the failure to give a jury instruction on limitations was a question of proof, and held the trial court's refusal to give the instruction was error "[b]ecause the issue of limitations had been raised and the jury was to decide the issue." *Id.* at 875. Concluding the error was harmful because "appellant hotly contested the limitations issue" and the jury was permitted to find "appellant guilty for conduct not within the limitations period," the Court of Appeals reversed the conviction and remanded the case for a new trial.[4] *Id.* at 876.

(a) A person commits an offense if, without the effective consent of the owner:
(1) he intentionally or knowingly damages or destroys the tangible property of the owner;
(2) he intentionally or knowingly tampers with the tangible property of the owner and causes pecuniary loss or substantial inconvenience to the owner or a third person; . . .

* * *

(c) For the purposes of this section, it shall be presumed that a person who is receiving the economic benefit of public communications, public water, gas, or power supply, has knowingly tampered with the tangible property of the owner if the communication or supply has been:
(1) diverted from passing through a metering device; or

(2) prevented from being correctly registered by a metering device; or
(3) activated by any device installed to obtain public communications, public water, gas, or power supply without a metering device.

3. Undisputed evidence established that in the fall of 1985 appellant's ex-wife told an Abilene police officer that she had observed appellant place the tap on the line. *See Ex parte Howlett*, 900 S.W.2d 937, 938 (Tex.App.—Eastland 1995, pet. ref'd).

4. In its harm analysis the Court of Appeals also cited the jury note sent to the trial judge during deliberations questioning whether finding the offense occurred on the date allege in the indictment was necessary and

The State now claims the Court of Appeals' holding conflicts with the "law of the case." The State contends that to be entitled to a jury instruction on limitations, appellant had to point to some evidence that called the matter into question. The State claims there had to be some evidence that the diversion of gas terminated three years prior to the date alleged in the indictment before appellant was entitled to a jury instruction because according to the law of the case "the offense of criminal mischief was continuing in nature." The State claims the trial court did not err in refusing to give the limitations instruction because the undisputed evidence established the offense continued up to the date alleged in the indictment.

Appellant asserts that "law of the case" does not apply to this case because the Court of Appeals' holding that the offense was a continuing in nature was "clearly erroneous." He contends pecuniary loss is not an element of the offense of criminal mischief because this Court has held that "the knowing and intentional tampering with the tangible property of the owner or a third person without the owner's consent is an offense even if it does not cause pecuniary loss." *Williams v. State*, 596 S.W.2d 862, 864 (Tex.Crim.App.1980). Appellant claims whether the natural gas continued to flow through the illegal valve until the time of discovery alleged in the indictment is of no consequence. As such, appellant asserts every element of the offense was completed in 1985 and the Court of Appeals correctly determined that he was entitled to a jury instruction on limitations.

## II.

Before we can resolve the issue presented we must determine whether the Court of Appeals reviewed the evidence under the appropriate legal standard. We begin our analysis by examining the doctrine of "law of the case" to determine whether it governs the issue of limitations.

In its most basic form the doctrine "provides that an appellate court's resolution of a question of law in a previous appeal of the same case will govern the disposition of the same issue when raised in a subsequent appeal." [5] Law of the case is a court-made doctrine designed to promote judicial consistency and efficiency that eliminates the need for appellate courts to prepare opinions discussing previously resolved matters. *Ex parte Granger, supra; LeBlanc v. State*, 826 S.W.2d 640, 644 (Tex.App.—Houston [14th Dist.] 1992, pet. ref'd). The doctrine assures trial courts that they can rely on the appellate court's disposition of an issue in presiding over the case and provides an incentive for trial courts to follow these decisions closely. *See Lee v. State*, 67 Tex. Crim. 137, 148 S.W. 706, 713 (1912) (opinion on motion for rehearing) (if rule were otherwise "trial courts would in a great measure be at sea, and would feel inclined and be authorized to give but little weight to the decisions of the [appellate] court.").

The doctrine's application is not inflexible. *Ex parte Granger*, 850 S.W.2d at 516. An appellate court may reconsider its earlier disposition of a point of law if the court determines there are "exceptional" circumstances that mitigate against relying on its prior decision. *Id.* Where the facts and issues are identical in a second appeal, the most common "exceptional" circumstance is that the earlier appears to have been "clearly erroneous." *Id.*

In the habeas corpus appeal the Court of Appeals held the offense of criminal mischief set out in Section 28.03(a)(2) is

whether the disconnection in August 1993 constituted tampering. *Howlett*, 946 S.W.2d at 876.

**5.** *Ex parte Granger*, 850 S.W.2d 513, 523 (Tex. Crim.App.1993) (citing *Ware v. State*, 736

S.W.2d 700, 701 (Tex.Crim.App.1987)); *see e.g., Granviel v. State*, 723 S.W.2d 141 (Tex. Crim.App.1986); *Ex parte Calvin*, 689 S.W.2d 460 (Tex.Crim.App.1985); *Willis v. State*, 479 S.W.2d 303 (Tex.Crim.App.1972).

"continuing" in nature and was "still being committed as long as the tap [was] installed and gas [was] being diverted, causing loss to the owner." *Ex parte Howlett,* 900 S.W.2d at 938. The court's disposition of this point of law became the "law of the case" throughout all future proceedings in the case, including the trial on the merits. *See e.g., Ware,* 736 S.W.2d at 701; *Granviel,* 723 S.W.2d at 147; *Willis,* 479 S.W.2d at 303. Appellant claims the Court of Appeals' determination of this point of law was "clearly erroneous" because according to *Williams v. State,* 596 S.W.2d 862 (Tex. Crim.App.1980) the object offense of criminal mischief does not require proof of pecuniary loss. Because pecuniary loss is not an element of the offense, appellant asserts the offense was completed in 1985 when each element of the crime had occurred. *Barnes v. State,* 824 S.W.2d 560 (Tex.Crim.App.1991). We disagree.

Appellant's reading of *Williams* is erroneous. The defendant in *Williams* was charged with criminal mischief under Section 28.03(a)(2). The indictment alleged the defendant "impaired and interrupted telephone communications," but contained no allegation that the illegal conduct resulted in "pecuniary loss or substantial inconvenience" to the owner. *Williams,* 596 S.W.2d at 864. The defendant claimed on appeal that the indictment was void because the indictment omitted an essential element of the offense. Overruling the defendant's ground of error, we determined the State did not omit an essential element because the offense of criminal mischief set out in subsection (a)(2) requires proof of "pecuniary loss *or* substantial inconvenience" to the owner. TEX. PENAL CODE ANN. § 28.03(a)(2) (emphasis added); *See Williams,* 596 S.W.2d at 864–65. We noted that subsection(a)(2) permits proof of either "pecuniary loss or substantial inconvenience" because it expands prior law to protect against "tampering" with the property "conduct that falls short of damaging the property but nevertheless interferes with the owner's proprietary rights or abuses the property

in a way that diminishes its value." *Id.* (citing practice commentary to Section 28.03 of the Texas Penal Code). We concluded the indictment alleged "substantial inconvenience" because the conduct alleged, tampering with a public service, is a third degree felony under the statute even if no pecuniary loss results. *Id.* at 865.

 Contrary to appellant, *Williams* does not eliminate the "pecuniary loss" element under subsection (a)(2). Instead, according to *Williams* the State must prove the accused's conduct caused either pecuniary loss or substantial inconvenience to the owner. In the instant case, the indictment alleged the owner sustained "pecuniary loss and substantial inconvenience." Although both elements were alleged in the conjunctive the State had the burden of proving either of them. *See e.g., Cowan v. State,* 562 S.W.2d 236 (Tex.Crim. App.1978). In light of the indictment in the instant case, we cannot say the Court of Appeal's holding that "the offense continued to occur as long as the unauthorized valve was in place and the owner suffered pecuniary loss" was clearly erroneous. Hence, the Court of Appeals' resolution of this issue was the law of the case.

 Having determined the law applicable to appellant's claim, we now address whether the Court of Appeals erred in holding the trial court was required to submit the requested limitations instruction. Limitations is a defense that must be raised by the evidence and which the defendant must timely bring to the trial court's attention before the court has a duty to instruct the jury on limitations. *See Proctor v. State,* 967 S.W.2d 840, 844 (Tex.Crim.App.1998). Where evidence that the offense is within the limitations period is undisputed the trial court has no duty to instruct the jury on the limitations defense. *Id.*

 The Court of Appeals concluded that the appellant raised limitations, but failed to cite to any evidence in the record

on which it relied and we find none.[6] *Howlett,* 946 S.W.2d at 875. The uncontroverted evidence showed the initial diversion of gas began in 1985, when the appellant installed the unauthorized valve, and continued until August 5, 1993, the date alleged in the indictment. No evidence was presented showing that the flow of gas terminated prior to August 1993 causing the limitations period to begin.[7] Because the evidence was undisputed that the owner suffered pecuniary loss up to a date alleged in the indictment, there was no fact issue for the jury to decide relating to limitations. We hold the trial court had no duty to instruct the jury on a limitations defense.

The judgment of the Court of Appeals is reversed. The judgment of the trial court is affirmed.

JOHNSON, J., filed a dissenting opinion.

MEYERS, J., did not participate.

JOHNSON, J., dissenting.

I respectfully dissent. The Court of Appeals reversed appellant's conviction on

---

**6.** To support its holding that the trial court should have instructed the jury on the limitations defense, the court of appeals relied on *Van Hoang v. State,* 939 S.W.2d 593 (Tex. Crim.App.1996). *Howlett,* 946 S.W.2d at 875. *Proctor* overruled *Van Hoang* because in that case there was no evidence raising the limitations defense. The undisputed evidence showed the limitations period had been tolled. *Proctor,* 967 S.W.2d at 844.

**7.** The dissent claims appellant was entitled to a jury instruction on limitations because "the issue of limitations was vigorously contested at trial by both sides." *Slip op.* at 11. A defendant is not entitled to a limitations instruction, however, simply because he insists the prosecution is limitations-barred. *Proctor,* 967 S.W.2d at 844. Because limitations is now a defensive issue, there must be some evidence that the prosecution is limitations-barred before a limitations instruction will be warranted. *Id.* Once the jury is presented with some evidence calling limitations into question, the State has the burden of proving beyond a reasonable doubt that the prosecution is not limitations-barred.

the basis that he was entitled to have the trial court instruct the jury on the statute of limitations applicable to the offense with which he was charged, criminal mischief. *Howlett v. State,* 946 S.W.2d 870 (Tex. App.—Eastland 1997, pet. granted). A majority of this court says that the Court of Appeals erred in its decision, as appellant was not entitled to such an instruction. *Ante,* at 668.

A significant discrepancy exists between the two opinions. The Court of Appeals stated that appellant "hotly contested the limitations issue at every stage of the proceedings from before trial until the current time." *Howlett v. State,* 946 S.W.2d at 875–876. Yet, the majority today states that "[t]he uncontroverted evidence showed the initial diversion of gas began in 1985, when the appellant installed the unauthorized valve, and continued until August 5, 1993, the date alleged in the indictment." *Ante,* at 667–68. It is true, as the majority states, that the Court of Appeals failed to cite any evidence in the record as support for its assertion. *Ante,* at 667; *Howlett v. State,* 946 S.W.2d at 875–876.

The record evidence cited by the dissent does not demonstrate the trial court erred in refusing to give a limitations instruction because it does not show appellant stopped illegally diverting the gas prior to August of 1993, let alone outside the limitations period. Instead, the extensive evidence cited by the dissent simply shows the State's witnesses neither possessed actual knowledge of the illegal diversion nor were aware of the number of cubic feet of gas appellant diverted to his residence. Limitations, however, is not raised by the inability of witnesses to testify as to whether something happened.

Appellant failed to introduce any evidence during his trial showing he stopped diverting the gas outside the limitations period. Instead, appellant testified that he was innocent and attempted to impeach the credibility of the State's witnesses on cross-examination by questioning them regarding having witnessed the diversion of gas and whether they could testify as to the amount of gas diverted. Appellant did not controvert the State's circumstantial evidence that the illegal diversion of gas continued until the tap was discovered on August 5, 1993.

However, our inquiry should not end there. We should not fault appellant because the Court of Appeals failed to support its assertion in its opinion. We have a judicial duty to consider the record ourselves and determine if there is support for that assertion. Even a casual perusal of the trial transcript shows that the limitations issue was "hotly contested".

Nine witnesses testified at appellant's trial, one for the defense (appellant) and eight for the prosecution: (1) Sharron Power, appellant's ex-wife; (2) James A. Rhodes, a customer service technician with Lone Star Gas; (3) Howard Gross, formerly a construction maintenance supervisor with Lone Star Gas; (4) Frank Lucia, a customer service technician with Lone Star Gas; (5) Bobby McFerrin, a customer service technician with Lone Star Gas; (6)Travis Miller, formerly a regional construction superintendent with Lone Star Gas; (7) Michael Janusz, a patrolman with the Abilene Police Department; and (8) Oliver Lee Harris, a facilities records analyst with Lone Star Gas. The limitations issue was brought up by the defense, the prosecution, or both, in examination of six of the eight prosecution witnesses. During the cross-examination of Lucia, the following exchange took place, in which defense counsel directly attacked the prosecution's theory that the alleged criminal conduct which had occurred was an offense continuing through 1993:

Q. Do you, Mr. Lucia, have any direct personal information as to whether or not any natural gas was taken through illegal means at 1502 Ballinger during the year 1993?

A. I saw the connection that was removed in '93.

Q. That is not what I asked you. I said do you have any direct personal knowledge that any gas was illegally taken to 1502 Ballinger during the year 1993?

A. No, sir.

Q. What about 1992, do you have any direct personal information or knowledge that any gas was taken illegally to 1502 Ballinger in the year 1992?

A. No, sir.

Q. What about 1991?

A. No, sir.

Q. 1990?

A. No, sir.

Q. 1989?

A. No, sir.

Q. 1988?

A. No, sir.

Q. 1987?

A. No, sir.

Q. 1986?

A. No, sir.

Q. 1985?

A. No, sir.

Q. 1984?

A. No.

Q. Any time before 1984?

A. No, sir.

Q. So from your own personal knowledge you can't say that Lone Star Gas lost one cubic foot of natural gas from illegal source?

A. I saw the illegal connection that he put on there.

Q. What I asked you, Mr. Lucia—I know what you want to talk about, but I want you to talk about this. Can you state from personal knowledge that Lone Star Gas lost one cubic foot of natural gas by an illegal connect at 1502 Ballinger?

A. Well, the connection was on there.

Q. Well, this's not the answer to the question that I asked you. I asked you do you have any knowledge of any gas being illegally diverted?

A. Why would he put the connection on?

The Court: Just a second. You don't get to ask questions.

A. No, sir.

Q. Your answer is no, is it not?

**670**

A. No, sir. Yes.

(S.F. vol. III, at 84–86). Similar exchanges occurred between defense counsel and McFerrin[1] and Miller.[2]

On redirect examination of Gross, the prosecution attempted to elicit testimony that there had been recent use of gas by appellant:

1. Q. Mr. McFerrin, do you have any personal knowledge that any gas was being taken illegally into 1502 Ballinger in August of 1993?

 A. What do you mean by that?
 Q. Well, I asked you if you have any personal knowledge that any gas was being taken illegally into 1502 Ballinger in the year 1993?
 A. I have no idea if it was gas into the house illegally.
 Q. What about 1992?
 A. No, sir.
 Q. '91?
 A. I have no idea.
 Q. '90?
 A. No, sir.
 Q. Any time in the 1980s?
 A. I have no idea, sir.
 (S.F. vol. III, at 99–100).

2. Q. Can you tell this jury how many cubic feet of natural gas flowed out of this fitting, if it did at all, in August of 1993?

 A. I can't truthfully tell you how much it flowed out, no.
 Q. Can you tell us how much flowed out of it in July of 1993?
 A. No, sir, I cannot.
 Q. June of 1993?
 A. No, sir.
 Q. At any month in 1993, can you tell this jury whether or not gas flowed out of this particular fitting?
 A. I personally cannot.
 Q. What about 1992?
 A. No, sir.
 Q. 1991?
 A. No, sir.
 Q. 1990?
 A. No, sir.
 Q. Any time in 1985?
 A. I can't tell you that, no.
 Q. Any time in the '80s?
 A. No, sir.
 Q. Any time in the '70s?
 A. No, sir.
 * * *
 Q. Did you test that line for presence of natural gas?
 A. We tested it in the area of where the T was at when we found the dirt black.

Q. Howard, I am going to back up just a little bit from where we were. When you were out there on I believe August 5th and 6th, when you were out there repairing the leaks was gas service to the homes ever cut off?

A. No.

Q. Did you find any natural gas in this copper line?
A. Not in the copper line. On the outside of the copper line at the T.
Q. So you found no gas inside the copper line?
A. I didn't test the inside of the copper line.
Q. Is this the copper line that you say that was in the house?
A. That, I can't tell you for sure.
Q. Where is the copper line that you say you found in the wall of the house?
A. That, I don't know.
Q. Did you lose it?
A. It is part of this.
Q. Did you lose it?
A. No. Officer Janusz had this.
Q. Would copper line such as this carry water in addition to natural gas?
A. Sure. Yes, sir.
Q. A swamp cooler carries water, does it not?
A. Sure could.
Q. And it would be very common to use pipe like this to carry water to a swamp cooler, would it not?
A. If you had one on the inside of the house, yes, sir.
Q. Can you tell the jury how many cubic feet of gas that you claim went through this pipe in August of 1993?
A. No, sir, I cannot.
Q. Can you tell them how many cubic feet of gas went through that line in July of 1993?
A. No, sir, I cannot.
Q. Any month in 1993?
A. No, sir, I cannot.
Q. Any month of any year in 1990?
A. No, sir.
Q. What about the 1980s?
A. I have no idea.
Q. What about the 1970?
A. I have no idea.
Q. Is there any way for you to determine that?
A. Determine that gas went through it?
Q. No, sir. Determine how much gas went through it at any particular time.
A. I cannot.
(S.F. vol. III, at 155–156, 167–169).

Q. What is the procedure when you were out there on the 12th replacing the gas main and replacing these risers, what is the procedure as far as *cutting off gas to the homes and things?*

A. Well, we get our new lines in there and then we run our new lines over to one meter at a time. We try to cut one customer off at a time where it wouldn't be inconvenient for all the customers. We did it one at a time.

Q. From your experience, 37 years experience with Lone Star Gas, if there was any line in that riser or in this particular riser and the gas was cut off and there was gas coming out of that valve would that be, I guess what I call *recent or fresh gas?*

A. Would it be any gas in it?

Q. Yes. Would there be any gas in it when you cut the service off to replace the riser?

A. It would be a very small amount, yes. It would be some unless it was leaking out somewhere else.

Q. But that gas that was there was *something you just recently cut off* just a few minutes before you started working on the riser, would that be fair?

A. *Yes.*

\* \* \*

Q. Now, did the—did you find anything with that instrument to find the lines, the line

indicator?

A. Yes. It helped. It was pretty close.

Q. Had anything—from what you remember seeing had anything been done to the copper tubing in certain places?

A. Yes. It was cut loose right before it went into the house and it was cut loose at the garage.

Q. Now, is the garage in the back towards the alley?

A. Yes. There was a mat of some kind covering the gas line where it was cut loose underneath the mat.

Q. Had it been dug up at all?

A. Yes.

Q. How could you tell?

A. Loose dirt.

Q. How could you tell that or *could you tell whether or not the copper tubing had been recently cut?*

A. *Yes, it was.* It was kind of shiny, so yes, it was kind of shiny.

Q. So from your experience of 37 years with Lone Star Gas what did that tell you?

A. That *it was recently cut.*

Q. Now, did y'all cut that?

A. No, we did not.

Q. It was like that when you found it?

A. Yes.

(S.F. vol. III, at 112–114, 116–117) (emphases added).

On recross-examination of Gross, defense counsel attempted to contest this issue:

Q. Let me ask you, Mr. Gross, did you ever have occasion on August the 12th, 1993 when you say you went out to the backyard at 1502 Ballinger to go into the house at 1502 Ballinger?

A. The only time I went in the house was—

Q. No, I asked you on that day did you go into the house?

A. If that's the day we searched the house, I did.

Q. So you went in the house and searched? *Did you find inside the house that there was any usage of natural gas going on at that time?*

A. *No.*

Q. Did you find any kind of a floor furnace?

A. No.

**672**

Q. Was a floor furnace pointed out to you, covered up by carpet?

A. No.

Q. Did you check the water heater?

A. No.

Q. Do you know whether it was electrical or gas?

A. No, I don't.

Q. Did you check any of the bathroom heaters as to whether they were gas or electrical?

A. No, I did not.

Q. *Did you find any evidence in the house at 1502 Ballinger of gas service to 1502 Ballinger?*

A. I found gas line in the garage behind—

Q. I asked you at 1502 Ballinger the house there, Mr. Gross, that is what we are talking about now, the house that you went into. Do you—let me ask you this, Mr. Gross. Typically my information is you have a wall here and a floor and a base board and *typically when you have gas being supplied in a house you have something coming out with a way to turn it on and a place where you can hook something to it,* correct?

A. That is correct.

Q. Now, that is kind of universal, is it not?

A. Yes.

Q. *Did you find any of these in the house at 1502 Ballinger?*

A. I did not look for any connections in the house or any appliance.

Q. Whether or not you looked for them or not, did you see any?

A. *No, I did not.*

(S.F. vol. III, at 134–135) (emphases added). On direct examination of Miller, the prosecution attempted to elicit testimony going to recent criminal activity by appellant:

Q. Did you ever go inside the house?

A. Went inside the house, yes, I did.

Q. Did you see any tubing inside the house?

A. Yes, we did.

Q. Did Mr. Howlett show you anything in the house?

A. He showed me a kerosene heater and a space heater which he said he used for heat.

Q. What about the water heater, do you know anything about it? Do you know whether it was gas or not?

A. I don't really recall looking at the water heater.

Q. Did he ever show you a covered floor furnace?

A. I don't recall a floor furnace, no, sir.

Q. Now, did you notice at the time that the tubing had been cut in different places?

A. Yes.

Q. From your 32 years with Lone Star Gas did the cuts—what did the cuts look like or *how long had it been since that tubing had been cut?*

A. *Not very long.*

Q. And what was that based upon?

A. Based upon the *tubing looking new* and the area of where it was being cut.

Q. Does copper stain easily?

A. Yes.

Q. What will cause it to stain?

A. Underground chemicals and things like that will cause it to turn kind of a dark color.

Q. And those ends were still shiny at the present time?

A. Yes, they were.

Q. Were the ends still in the dirt?

A. Yes.

Q. Was any of the—*had any of the dirt been disturbed by where you found the ends cut had the dirt been disturbed or dug up recently?*

A. *Yes, it had.*

Q. Did you find any tubing inside the residence?

A. Yes, we did.

Q. And about how much, do you remember?

A. In the area of 15 to 18 feet, I remember, I believe.

Q. And was it covered?

A. It was behind the base board in the garage.

Q. That garage was attached to the house?

A. Yes, attached to the house, yes, sir.

(S.F. vol. III, at 151–153) (emphases added).

During re-direct, there was the following testimony:

Q. Do you have an opinion as to whether or not this copper tubing was put in before or after that slab was on the ground?

A. It would have to be before because there was some concrete poured on top of it and contacted with it.

Q. Now, from everything that you saw that day and including this riser, the indication of the gas in the ground, *do you have an opinion as to whether or not gas was being diverted from the meter into the residence at 1502 Ballinger?*

A. There was gas on this line going to the buildings.

Q. And going to the residence at 1502 Ballinger?

A. *Yes, sir.*

(S.F. vol. III, at 176) (emphases added). Defense counsel attempted to contest this with the following:

Q. Did you find gas coming into that double garage?

A. It had been cut loose. No, sir, I did not.

Q. I am asking you what you observed, *if you saw any gas being diverted into any part of that house?*

A. *No, sir, I did not.*

Q. At the time you went in there was any gas being diverted into any part of this house?

A. No, sir, it was not visible.

Q. Did you look and try to find an area where it was being diverted into the house?

A. We did find an area.

Q. That gas was coming into the house?

A. Where the tubing used to go through the wall.

Q. If you put a match to it would it light?

A. No, sir, it had been cut loose.

Q. Is that the line that you said was perfectly capable of carrying water for a swamp cooler?

A. Yes, sir, it is.

Q. When was that gas being diverted into the premises, *do you know when it was diverted*

*in there in August of 1993?*

A. Where it was connected up at the meter?

Q. No, sir. I asked you a specific question?

A. *I can't answer that. I don't know.*

Q. *Can you answer specifically as to any time when it was being diverted into the house?*

A. *No, sir, I cannot because I did not see it being diverted in there.*

(S.F. vol. III, at 179–180) (emphases added). On direct examination of Janusz, the following testimony was elicited by the prosecution:

Q. Do you know what type of heaters they were?

A. They were heaters run—designed to run on natural gas.

Q. *Could you tell whether or not they had been used recently?*

A. Well, when I looked at the heaters I could see that there was dust all—

Defense Counsel: That is not responsive to the question that was asked.

The Court: Overrule the objection. Go ahead.

Q. Was there anything about the heaters?

A. Well—

Q. *From what you could tell to see whether or not they had been used recently or not?*

A. Well, this was August so I would assume that they weren't used to heat anything in August, but I could tell that those heaters—

Defense Counsel: We object to his assumptions about anything. If we don't object to him stating the facts that he knows, but we object to him getting into his opinions and assumptions.

The Court: Overrule the objection.

Q. What could you tell about the heaters whether or not they were used?

A. *Well, the treads on the heaters looked like they had been recently disconnected* because there was no dust on them and there was dust on the entire unit except the connection to a—to some copper tubing so that would indicate to me that it was just—somebody just took those things apart, took them off before they were hanging.

Q. Where the pictures [sic] taken from is where they were when you found them?

A. No. They were sitting up in that storage area at 1502 Ballinger, that little add-on section of his metal workshop and they were both sitting on a shelf and I photographed them because they were obviously used to heat.

Q. Did you take them off the shelf and put them on the floor to take a picture?

A. Right. That is why I took them off, I was thinking about seizing them, but I decided to photograph them.

Q. You put them back on the shelf and left the heaters there?

A. Right.

(S.F. vol. IV, at 216–218) (emphases added). Finally, on direct examination of Harris, the prosecution elicited the following:

Q. Did this illegal connection not only provide a pecuniary loss, but did it also provide a substantial inconvenience for Lone Star Gas Company?

A. Yes.

Q. *Now, were you able to estimate the amount of gas that was lost in this particular case?*

A. Yes. They came up with—it is an estimate.

* * *

Q. Now, you said you had an estimate. Do you know what that estimate was? .

A. *Approximately $3,300.00, in that neighborhood.*

Q. That was from what time period to what time period?

A. *January of '89 through I want to say August of '93.*

Q. So you just took that period of time?

A. Yes.

(S.F. vol. IV, at 223–225) (emphases added). Defense counsel attempted to contest this with the following:

Q. *How many cubic feet of natural gas passed through this riser in August of 1993?*

A. *I can't answer that.*

Q. How many cubic fight [sic] of natural gas passed through that riser in July of 1993?

A. I can't answer that.

Q. What about June of 1993?

A. No, I can't answer it.

Q. May of 1993?

A. No. .

Q. *Any month of 1993, can you tell us how many cubic feet of natural gas, if any, passed through this riser?*

A. *I cannot tell you how much, no.*

Q. *Can you tell me how much natural gas, if any, passed through this riser in any month in the years 1990, 1991, 1992?*

A. Let me—

Q. No, sir, just answer my questions.

A. *No, sir.*

Q. *Can you tell me how many cubic feet of gas, if any, passed through this riser in any of the years designated 1980, '81, '82, '83, '84, '85, '86,-'87, '88, '89?*

A. *No, I can't.*

Q. Mr. Harris, other than by speculation and conjecture you can't tell this jury with

certainty whether or not any gas ever passed through this riser at all illegally, can you?

A. No, sir.

(S.F. vol. IV, at 225–227) (emphases added).

As this testimony makes clear, the issue of limitations was vigorously contested at trial by both sides. Under such circumstances, it was error not to give an instruction on the issue of limitations when it was requested by appellant. *Proctor v. State,* 967 S.W.2d 840, 844 (Tex.Crim.App.1998).

As to the issue of harm, the vigorous contesting of this issue suggests, in and of itself, that not giving the instruction was harmful. Harm is also shown by the fact that the jury sent out a note to the trial judge specifically asking about the limitations issue. The record reflects the following in regard to the note from the jury:

Jury: Does this need to be proven on this date, August 5, 1993, that Jimmy Howlett, tampered then or can we decide on this determination on 1985? Does this also include disconnection in August 1993, be considered tampering?

Trial Court: The Court, under the law, is not permitted to answer the question which you have presented.

Please consider only the instructions which have already been given you and the evidence admitted before you during the trial of this cause, and continue your deliberations.

(C.R., at 103–105).

There can be no doubt that the refusal of the court to instruct the jury on limitations affected its deliberations. As such, a "substantial right" was affected. Tex. R.App. P. 44.2(b). The judgment of the Court of Appeals should be affirmed and the cause remanded for a new trial.

In response to this dissent, the majority radically alters the law and jurisprudence of this state in two ways. First, it effectively overrules, *sub silentio, Proctor v. State, supra,* a decision by this court that is barely a year old. The majority states that the record evidence cited "does not show appellant stopped illegally diverting the gas prior to August of 1993." *Ante,* at 668 n. 7. In *Proctor,* we held that the statute of limitations is a defense, and that

the defendant may assert the defense by requesting a jury instruction on limitations if there is *some evidence before the jury, from any source,* that the prosecution is limitations-barred. If there is some such evidence *and the defendant requests a jury instruction* on the limitations defense, *then the State must prove beyond a reasonable doubt that the prosecution is not limitations-barred.*

*Proctor,* 967 S.W.2d at 844 (emphases added). Clearly, the testimony cited throughout this opinion raises "some evidence," and appellant requested a jury instruction. (S.F. vol. IV, at 318–323; C.R., at 101–102). Under *Proctor,* the burden of going forward thus requires the state to prove beyond a reasonable doubt that the prosecution is not limitations-barred. Now, however, it is not enough that there be "some evidence" that the prosecution is limitations-barred. Now, a trial court is not required to give an instruction to the jury unless the defendant can meet a new, undefined standard of

proof ("show") that the prosecution is limitations-barred. In addition, the majority turns the burden of going forward on its head and now requires the appellant to prove his innocence, thus relieving the state of its burden of proof beyond a reasonable doubt. When, as here, the state's case is circumstantial, the "inability of witnesses to testify as to whether something happened,"*ante,* at 668 n. 7. and, by implication, the inability of witnesses to testify as to *when* something happened, does raise "some evidence" that the statute of limitations is implicated. When the defense of limitations is raised by "some evidence," the state's burden includes proving that appellant illegally diverted gas within the limitations period, yet the majority affirms the denial of a limitations instruction, saying that appellant "failed to introduce any evidence that he stopped diverting the gas outside of the limitations period." *Ante,* at 668 n. 7. The majority seems to have forgotten that a criminal defendant must prove nothing and may be acquitted without presenting any evidence at all.

The majority does not even mention the jury's note to the court, a note which clearly attests to the jury's concern with the statute of limitations, i.e., *when* appellant had committed the alleged criminal activity. Despite the jury's recognition that this issue was contested, the majority now determines for itself that appellant did not "show" that illegal diversion of the gas ceased prior to August of 1993, and that the state did prove, through circumstantial evidence and beyond a reasonable doubt, that gas was illegally diverted until and after August of 1993. *Ante,* at 668 n. 7. The majority has taken it upon itself to resolve a factual matter which the factfinder, the jury, was not allowed to resolve because the requested instruction on the statute of limitations was refused. Such an approach is contrary to the most basic principles of appellate review. *See, e.g., Wright v. State,* 981 S.W.2d 197, 201 (Tex. Crim.App.1998) (court of appeals may not take on role of fact-finder, which is re-

served for jury); *Clewis v. State,* 922 S.W.2d 126, 135 (Tex.Crim.App.1996) (appropriate balance between jury's role as judge of facts and reviewing court's duty to review criminal convictions is struck by not allowing appellate court to "find" facts, or substitute its judgment for that of jury); TEX.CODE CRIM. PROC. art. 36.13 (jury is judge of facts).

For the foregoing reasons, I respectfully dissent.