

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS

## NO. AP-77,071

**JOHN RAY FALK, JR., Appellant**

**v.**

**THE STATE OF TEXAS**

### ON DIRECT APPEAL FROM CAUSE NO. 27347 IN THE 278TH DISTRICT COURT WALKER COUNTY

*Per curiam.*

### O P I N I O N

In February 2017, Appellant pleaded guilty before a jury to capital murder, the allegation being that he intentionally or knowingly caused the death of another "while escaping or attempting to escape from a penal institution." TEX. PENAL CODE §§ 19.03(a)(4), 19.02(b)(1). Based on the jury's answers to the special issues set forth in Texas Code of Criminal Procedure Article 37.071, Sections 2(b) and 2(e), the trial court sentenced Appellant to death. *See* TEX. CODE CRIM. PROC. art.

37.071, § 2(g).[1]  Direct appeal to this Court is automatic.  Art. 37.071, § 2(h).

Appellant raises twenty points of error.[2]  In point of error one, Appellant alleges that his second trial was barred by double jeopardy because his first trial ended in an improper mistrial.  In points of error two and three, Appellant contends that the trial court improperly conducted trial-related business outside his presence.  In points of error five and six, Appellant argues that the trial court erred by finding him competent to stand trial without a formal, contested competency hearing.  Similarly, in point of error seven, Appellant argues that the trial court erred in allowing him to represent himself because he lacked the mental capacity to conduct his own defense.  In points of error eight and nine, Appellant challenges the restrictions placed upon his standby counsel.  In points of error sixteen and seventeen, Appellant contends that the trial court made prejudicial comments during jury selection.  In points of error four and eighteen, Appellant argues that the trial court improperly impaneled the jury as constituted.   In points of error ten through fourteen, Appellant raises challenges to the validity of his guilty plea.  In points of error fifteen, nineteen, and twenty, Appellant argues that his death sentence violates the Eighth Amendment to the United States Constitution.  After reviewing Appellant's points of error, we affirm the trial court's judgment of conviction and sentence of death.

## I.  BACKGROUND

---

[1]  Unless otherwise indicated, all subsequent citations in this opinion to "Articles" refer to the Texas Code of Criminal Procedure, and all subsequent citations to "Rules" refer to the Texas Rules of Appellate Procedure.

[2]  Appellant filed his corrected opening brief in June 2019.  In December 2019, Appellant submitted an "Unopposed Motion to File a Supplemental Brief."  This supplemental brief alleged two additional errors in points of error two and three, *see infra*, and added two wholly new points of error, for a total of twenty-two.  We denied Appellant's motion, so we do not address his supplemental arguments or points of error.

This is the second time Appellant has been tried on capital murder charges based on the same underlying conduct. The first trial ended in a mistrial. In an interlocutory mandamus proceeding arising out of the first trial, we summarized the facts of the offense as follows.

> John Ray Falk, Jr. and Jerry Duane Martin escaped from prison, and during that escape, Susan Canfield, a prison guard, was killed. . . . Canfield was on horseback, attempting to prevent Falk and Martin from escaping, when Falk jabbed a stolen revolver into Canfield's side and obtained her rifle. After disarming Canfield, Falk backed away. As Falk was backing away, Martin drove a pickup truck into Canfield and her horse—causing injuries that ultimately led to her death. Falk then jumped into the truck, and the truck sped away.

*In re State ex rel. Weeks*, 391 S.W.3d 117, 119–20 (Tex. Crim. App. 2013). This offense was alleged to have occurred on September 24, 2007. Appellant's first capital murder trial began in November 2012. During the trial, the trial court erroneously refused to submit a jury instruction on one theory of party liability and misstated the law in the jury charge on another. The State sought mandamus relief, which we ultimately granted. *See Weeks*, 391 S.W.3d at 120.

When the case returned to the trial court in January 2013, more than seven weeks had passed. By that point, the trial court had begun to harbor serious reservations about allowing the case to proceed to a verdict. The Waco Court of Appeals later summarized:

> The trial judge expressed concern over what to tell the jury after the fifty-five-day delay, and with there being twenty-four witnesses, he was also concerned with how well the jury would be able to remember the trial testimony after the lengthy delay. The trial judge was skeptical of the State's proposal of extra time for closing argument so they could spend more time reviewing the trial testimony for the jury to refresh the jurors' memories; at several times during argument on Falk's motion for directed verdict, there was substantial argument and disagreement over the testimony of certain witnesses.

*Ex parte Falk*, 449 S.W.3d 500, 506 (Tex. App.—Waco 2014, pet. ref'd), *cert. denied*, 575 U.S. 918 (2015). With these concerns in mind, the trial court ordered a mistrial on its own initiative.

### A. Double jeopardy litigation

A few months after the mistrial order, in May 2013, Appellant filed a pre-trial application for a writ of habeas corpus. Among other things, Appellant argued that because he had not consented to the mistrial order, and because there was no "manifest necessity" to support that order, the Double Jeopardy Clause precluded his re-prosecution. Appellant also argued that the trial court's initial comments about the lack of evidence to support the State's intent-to-promote-or-assist theory amounted to an acquittal on that theory—such that, should Appellant be retried, resubmitting that theory to the jury would likewise violate double jeopardy protections. The trial court, acting as habeas court, denied the application on both bases and, in a published opinion, the Waco Court of Appeals affirmed. *See id.* at 511. Appellant filed a petition for discretionary review asking this Court to reverse the court of appeals' judgment. We refused Appellant's petition. Appellant then filed a petition for writ of certiorari in the Supreme Court of the United States. In March 2015, the Supreme Court denied Appellant's petition. *See Falk v. Texas*, 575 U.S. 918 (2015).

### B. Retrial

In June 2015, Appellant was reindicted for capital murder. Jury selection began in January 2017. Two weeks and thirty-three prospective jurors into that process, Appellant invoked his Sixth Amendment right of self-representation and asked the trial court to relegate his lawyers to the role of "side chair counsel." Appellant's counsel vehemently opposed this idea, asserting that Appellant was only invoking that right so that he could facilitate his own execution: "He just wants to not live in prison for the rest of his life. He just wants to die."

The trial court conducted a *Faretta* hearing to ensure that Appellant understood "the dangers and disadvantages of self-representation." *See Faretta v. California*, 422 U.S. 806, 835 (1975).

Initially satisfied that Appellant was knowingly and voluntarily waiving his right to counsel, the trial court verbally signaled its intent to allow Appellant to waive his right to counsel and proceed *pro se*, with his current lawyers remaining on the case as "standby counsel." The trial court informed Appellant that, the following morning, he would be asked to execute a written waiver-of-counsel form, *see* Art. 1.051(g), after which he would be allowed to represent himself.

However, before Appellant could execute a written waiver-of-counsel form, the trial court decided that Appellant should be evaluated for his competency to stand trial and mental capacity for self-representation. After Appellant was examined by a court-appointed expert and deemed "competent to stand trial and competent to determine if he should represent himself," the trial court honored Appellant's request for self-representation.

From that moment on, Appellant offered no meaningful adversarial testing of the State's case. For the rest of individual *voir dire*, Appellant mostly remained silent. He asked a few of the prospective jurors about their ability to follow the law, but he did not move to strike any of the jurors for cause, and he did not use any peremptory strikes. At one point, outside the presence of the potential jurors, the trial court remarked that it was "apparent to all of us" that Appellant "desire[d] that he be found guilty of capital murder and [that] the jury assess the death penalty in this case." The trial court further stated Appellant's strategic decisions represented "a form of suicide."

The guilt phase of trial consisted of Appellant pleading guilty to the indictment.[3] In the

---

[3] We have sometimes described guilty plea proceedings as "unitary" proceedings, thereby eliminating the need to distinguish between the ordinary phases of trial—guilt and punishment. But we have also said that the distinction between "unitary" and "bifurcated" trials is "moot" in capital cases, because "Art[icle] 37.071 governs all capital cases and it provides for a trial by jury upon the issues related to punishment." *Williams v. State*, 674 S.W.2d 315, 319 n.2 (Tex. Crim. App. 1984). The parties in the instant case describe the trial as proceeding in distinct "phase[s]." So, for clarity's sake, and not intending any substantive change in the law, we shall use the same

punishment phase, Appellant did not object to any of the State's evidence, and he offered no evidence of his own. In terms of cross-examination, Appellant asked a single question of a single State's witness, a prisoner named Noah Melton: "How you doing, Noah?" Appellant did not otherwise cross-examine any of the State's witnesses.

The State presented a significant amount of evidence at punishment. The State elicited testimony from several witnesses describing: Appellant's role in the instant offense and the mayhem that he and Martin caused when they escaped; Appellant's lack of remorse for his role in Canfield's death; Appellant's unruly and violent behavior while in confinement, both preceding and following his incarceration for the instant offense; the gruesome 1986 murder to which Appellant pleaded guilty and for which Appellant was incarcerated when he committed the instant offense; and the warm, decent, and by all accounts honorable person that Canfield was.

Ultimately, the jury found beyond a reasonable doubt that: (1) there was a probability that Appellant would commit criminal acts of violence that would constitute a continuing threat to society, *see* Art. 37.071, § 2(b)(1); and (2) Appellant either caused Canfield's death, intended to kill Canfield or another, or anticipated that a human life would be taken, *see* Art. 37.071, § 2(b)(2). The jury further found that there were insufficient mitigating circumstances to warrant a sentence of life imprisonment without parole, *see* Art. 37.071, § 2(e). In accordance with the jury's answers to these issues, the trial court sentenced Appellant to death. *See* Art. 37.071, § 2(g). This appeal followed.

We proceed now to an analysis of Appellant's points of error. We will first address Appellant's double jeopardy claims. Second, we will address his claims regarding the trial court conducting trial-related business outside his presence. Third, we will address his claims that the trial

terminology.

court erred by finding him competent to stand trial without a formal, contested hearing and his claim that the trial court improperly allowed him to represent himself. Fourth, we will address his challenges to restrictions on standby counsel. Fifth, we will address his claims that the trial court made prejudicial comments during jury selection. Sixth, we will address his arguments regarding the impaneling of the jury. Seventh, we will address his challenges to the validity of his guilty plea. Finally, we will address his Eighth Amendment arguments challenging his death sentence.

## II. DOUBLE JEOPARDY

In point of error one, Appellant argues that the Double Jeopardy Clause of the United States Constitution barred his re-prosecution for the instant offense after his first capital murder trial ended in a mistrial. *See, e.g.*, *Oregon v. Kennedy*, 456 U.S. 667, 671–72 (1982). He also argues that the State violated double jeopardy by retrying him "under a theory of party liability under § 7.02(a)," because the trial court's earlier comments about the lack of evidence to support that theory amounted to an acquittal. *See, e.g.*, *Evans v. Michigan*, 568 U.S. 313, 318 (2013).

Both of these claims were raised and rejected in the course of Appellant's earlier double jeopardy litigation, recounted above. *See Falk*, 449 S.W.3d at 504, 508. We received and gave due consideration to Appellant's petition for discretionary review complaining of error in the court of appeals' analysis. Ultimately, both we and the United States Supreme Court declined to exercise our discretion to review the court of appeals' judgment. Under these circumstances, we conclude that the court of appeals' earlier resolutions of Appellant's double jeopardy claims became the law of the case, such that further review at this stage is unwarranted. *See Howlett v. State*, 994 S.W.2d 663, 666 (Tex. Crim. App. 1999) (citations omitted) (explaining that the "law of the case" doctrine provides "that an appellate court's resolution of a question of law in a previous appeal of the same

case will govern the disposition of the same issue when raised in a subsequent appeal.").

Appellant argues that the "the summary refusal of a petition for discretionary review by this Court is of no precedential value." *See Sheffield v. State*, 650 S.W.2d 813, 814 (Tex. Crim. App. 1983). That is true. It is also true that the Supreme Court's denial of a petition for writ of certiorari carries no binding legal significance. *See, e.g.*, *Teague v. Lane*, 489 U.S. 288, 296 (1989). But that does not mean that we cannot take our refusal or the Supreme Court's denial of certiorari into account in deciding the prudential question of whether the law of the case doctrine ought to apply to these circumstances. Considering both prior discretionary review refusals and our view that the court of appeals' analysis was not "clearly erroneous", *see Howlett*, 994 S.W.2d at 666), we hold that the court of appeals' resolution of Appellant's double jeopardy claims is the law of the case and we need not reconsider his claims here. *See Howlett*, 994 S.W.2d at 666 (applying the law of the case doctrine when previous review of legal issue was not "clearly erroneous").

Appellant also argues that applying the law of the case doctrine would deprive him of his statutory right to have this Court automatically review the conviction and sentence in a case in which the death penalty was imposed. *See* Art. 37.071(h). We disagree. "[R]eview," in contemplation of Article 37.071(h), does not invariably mean merits review on every point. *See id.* If it did, then the statute would arguably prohibit us from applying the ordinary rules of procedural default. That being the case, our resolution does not frustrate Appellant's statutory right of review in this Court. Appellant has made his claim of error in this Court, and we are disposing of it, albeit on the basis of a prudential, estoppel-like doctrine rather than on the merits of his claim.

Neither does our resolution frustrate any constitutional right Appellant may have to receive "meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or

irrationally." *See Parker v. Dugger*, 498 U.S. 308, 321 (1991). Appellant received meaningful appellate review when the court of appeals issued a carefully wrought, record-based opinion disposing of Appellant's double jeopardy claims on their merits. *See id.* ("It cannot be gainsaid that meaningful appellate review requires that the appellate court consider the defendant's actual record.").

Finally, Appellant cites cases in which we have said that the law of the case doctrine applies only when the legal issue was determined by a "court of last resort." *See, e.g.*, *Granger*, 850 S.W.2d at 516 (citations omitted). We have never definitively said what constitutes a "court of last resort" in contemplation of the law of the case doctrine. But we have previously described at least two lower-tier appellate court rulings as "law of the case." *See Howlett*, 994 S.W.2d at 666–67; *Ex parte Calvin*, 689 S.W.2d 460, 462–63 (Tex. Crim. App. 1985). Again, that does not mean that lower-tier appellate court rulings legally bind us to rule one way or another, in the case under review or in any other case. It means only that, as a matter of prudence, we may exercise our discretion not to revisit a settled legal issue, even if it was settled by a lower-tier appellate court. *See George E. Dix & John M. Schmolesky*, 43B TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 56:154 (3d. ed. 2020) ("Once a matter has been finally determined in the appellate process, even if not by the Court of Criminal Appeals, considerations of efficiency and consistency suggest that the Court of Criminal Appeals should be reluctant to reach back and resurrect the issue for reconsideration."). Point of error one is overruled.

### III.  PRE-TRIAL AND TRIAL ABSENCES

In points of error two and three, Appellant complains on statutory and constitutional grounds that the trial court committed reversible error by conducting trial-related business outside his

presence. *See* U.S. CONST. amends. V, VI, XIV; Arts. 28.01, 33.03.

The Sixth and Fourteenth Amendments to the United States Constitution guarantee a criminal defendant "the right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987); *see also Jasper v. State*, 61 S.W.3d 413, 423 (Tex. Crim. App. 2001). So, "even in situations where the defendant is not actually confronting witnesses or evidence against him, he has a due process right to be present in his own person whenever his presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge." *Stincer*, 482 U.S. at 745 (internal quotation marks omitted) (quoting *Snyder v. Massachusetts*, 291 U.S. 97, 105–06 (1934)). Violations of this right are subject to harmless error review under the standard associated with constitutional errors. *See Jasper*, 61 S.W.3d at 423. If the record reveals that the defendant was excluded without his consent from a stage of trial that the Constitution gave him a right to attend, we must reverse unless we determine beyond a reasonable doubt that this exclusion did not contribute to the conviction or punishment. *See* Rule 44.2(a).

Texas statutes also guarantee a criminal defendant the right to be personally present at the proceedings against him. Indeed, some of our statutes speak of the defendant's presence as a requirement. Article 28.01, for instance, says that the defendant's presence "is required during any pre-trial proceeding." Article 33.03 uses similar mandatory language, stating that in "all prosecutions for felonies, the defendant must be personally present at the trial."

However, not every pre-trial courtroom occurrence constitutes a "proceeding" in contemplation of Article 28.01. *See Adanandus v. State*, 866 S.W.2d 210, 218 (Tex. Crim. App. 1993) (citations omitted). And "the trial," as that term is used in Article 33.03, does not begin at

least until the "general assembly portion of jury selection" has concluded. *See Jasper*, 61 S.W.3d at 423 (citations omitted). Furthermore, the mandatory language used in these statutes does not mean that a violation of either statute is immune from harmless error review. *See, e.g.*, *Cain v. State*, 947 S.W.2d 262, 264 (Tex. Crim. App. 1997) (observing that even "mandatory requirement[s]" may be subject to harmless error analysis). Assuming one of these provisions is violated and no comparable constitutional error is shown, the violation is subject to harmless error review under the standard associated with non-constitutional errors. *Cf. Jacobs v. State*, 560 S.W.3d 205, 209 (Tex. Crim. App. 2018) (concluding that the "only . . . kind of harm analysis that could possibly apply" to constitutional error was the "constitutional error standard contained in Rule of Appellate Procedure 44.2(a)."). Therefore, a violation of either of these statutes, without additional showing of constitutional error, "must be disregarded" unless we determine that the violation affected Appellant's "substantial rights." *See* Rule 44.2(b).

### A. Appellant's absence from the November 19, 2015 telephonic status conference resulted in no constitutional or statutory error.

Appellant first complains that the trial court, one of Appellant's defense lawyers, and two of the trial prosecutors participated in a telephonic status conference in Appellant's absence on November 19, 2015. The call's participants had discussed a wide variety of topics, including discovery, venue, defense counsel's access to Appellant, expert-witness funding, other unspecified "money issues," and "the possibility of a motion to quash the indictment." However, the trial court did not make any rulings at the conference.

We conclude that this phone call was neither a "critical stage" in contemplation of Appellant's constitutional right to be present, nor a "pre-trial proceeding" in contemplation of Article

28.01, nor part of "the trial" in contemplation of Article 33.03. First, Appellant's presence on the phone call would not have "contribute[d] to the fairness of th[at] procedure." *See Stincer*, 482 U.S. at 745. Based on the trial court's summary of the call, everything that was discussed can fairly be described as preliminary. No motions were filed and no written orders were issued. Appellant argues that his absence from the call left him ignorant of the topics discussed—discovery, venue, expert witnesses, *et cetera*. But Appellant's absence from a phone call discussing these topics does not establish that he was necessarily ignorant of the topics discussed. And Appellant does not explain what contributions he might have been able to make or why they might have been important for the court to hear. Under these circumstances, we conclude that Appellant's absence from the November 19 phone call was not constitutional error.

Similarly, the November 19 phone call was not a "pre-trial proceeding" in contemplation of Article 28.01. The record shows that no motions came "to be heard." *See Malcom v. State*, 628 S.W.2d 790, 792 (Tex. Crim. App. 1982) (citations omitted). And no written orders were entered. *See Adanandus*, 866 S.W.2d at 218. The trial court's comments indicate that it would resolve many, if not most, of the matters discussed at some later date. It does not appear that the trial court took any action, final or otherwise. The record does not support Appellant's assertion that a "pre-trial proceeding" under Article 28.01 took place on November 19.

Finally, the November 19 phone call took place well before the general assembly portion of jury selection began. Therefore, Appellant was not excluded from "the trial" in contemplation of Article 33.03. *See Jasper*, 61 S.W.3d at 423. Appellant's absence from the November 19th phone conference did not amount to statutory or constitutional error.

**B. Appellant's absence from the *in camera* hearing on January 31, 2017 was**

**harmless beyond a reasonable doubt.**

Appellant also complains about his absence from part of an *in camera* hearing on January 31, 2017, the day after he invoked his right of self-representation. At this hearing, defense counsel asked the trial court to appoint an expert for the purpose of assessing Appellant's mental capacity to proceed *pro se*. Before the trial court took any action on defense counsel's motion, Appellant, seated in the courtroom, made it known to the court that he objected to his exclusion from chambers. In response, the court moved the hearing into the courtroom and summarized what had already been discussed. At the conclusion of this hearing, the trial court stayed the proceedings and ordered that Appellant be examined for his competency to stand trial and his mental capacity to self-represent. Appellant initially opposed the examination, but ultimately cooperated with it.

We will assume without deciding that the initial *in camera* portion of this hearing was not only a part of Appellant's "trial" under Article 33.03 (occurring, as it did, after the commencement of individual *voir dire*), but also a "critical stage" in contemplation of Appellant's constitutional right to be physically present at trial. *See Stincer*, 482 U.S. at 745. Nevertheless, any error was harmless beyond a reasonable doubt. *See* Rule 44.2(a).

As soon as the trial court realized that Appellant wished to attend the hearing, it moved the hearing into the courtroom so that Appellant could be present and participate in it. The court then told Appellant what the court and the lawyers had already discussed. At that point in the hearing, the court had not yet decided how to proceed. The court eventually decided to have Appellant evaluated for his competency to stand trial and capacity to represent himself, later finding that Appellant was both competent to stand trial and capable of self-representation. Even if Appellant had been physically present at the *in camera* portion of this hearing, the outcome of the hearing or

the trial would not have been any different. We conclude, beyond a reasonable doubt, that Appellant's absence from the *in camera* portion of the January 31, 2017 hearing did not contribute to his conviction or sentence. *See* Rule 44.2(a).

Points of error two and three are overruled.

## IV. COMPETENCY TO STAND TRIAL AND THE RIGHT OF SELF-REPRESENTATION

In points of error five and six, Appellant argues on statutory and constitutional grounds that the trial court erred by deeming Appellant competent to stand trial without first holding a formal, contested competency hearing. *See* TEX. CODE CRIM. PROC. ch. 46B; *Pate v. Robinson*, 383 U.S. 375, 378 (1966). In point of error seven, Appellant argues that, because he lacked the mental capacity to personally conduct his own defense, the trial court erred by allowing him to represent himself. *See Indiana v. Edwards*, 554 U.S. 164, 177–78 (2008).

Subjecting an incompetent defendant to a criminal trial violates due process. *See, e.g.*, *Cooper v. Oklahoma*, 517 U.S. 348, 354 (1996). Therefore, a defendant may not be put to trial unless "he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding . . . [and] a rational as well as factual understanding of the proceedings against him." *Id.* (internal quotation marks omitted) (quoting *Dusky v. United States*, 362 U.S. 402, 402 (1960) (*per curiam*)). Due process also requires "that state procedures . . . be adequate to protect" against the possibility that the person on trial is incompetent. *See Pate*, 383 U.S. at 378.

To that end, Chapter 46B of the Code of Criminal Procedure "has codified the constitutional standard for competency to stand trial and has elaborately described the circumstances that require, and procedures for making, a determination of whether a defendant is competent to stand trial." *See*

*Turner v. State*, 422 S.W.3d 676, 689 (Tex. Crim. App. 2013). "Either party may suggest by motion, or the trial court may suggest on its own motion, that the defendant may be incompetent to stand trial." Art. 46B.004(a). "On suggestion that the defendant may be incompetent to stand trial, the court shall determine by informal inquiry whether there is some evidence from any source that would support a finding that the defendant may be incompetent to stand trial." Art. 46B.004(c). If, after this "informal inquiry," the court "determines that evidence exists to support a finding of incompetency, the court shall order an examination . . . to determine whether the defendant is incompetent to stand trial." Art. 46B.005(a). And, "[e]xcept as provided by Subsection (c), the court shall hold a trial under Subchapter C before determining whether the defendant is incompetent to stand trial on the merits." Art. 46B.005(b).

Related to the concept of a criminal defendant's competence to stand trial is the concept of the defendant's mental capacity to defend himself. In *Faretta v. California*, the Supreme Court held that the Sixth Amendment "does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense." 422 U.S. at 819. So, at least where "the record affirmatively shows that" the defendant is "literate, competent, and understanding," and is "voluntarily exercising his informed free will," the Constitution ordinarily requires that the defendant's asserted right of self-representation be honored. *Id.* at 835–36.

But, if the facts warrant it, a trial court has some discretion to limit a defendant's right of self-representation. In *Indiana v. Edwards*, the Supreme Court reassessed *Faretta* in the context of "gray-area defendant[s]," that is, defendants who meet the minimal standard of competency to stand trial but who still suffer from such "severe mental illness" that, realistically, they lack the "mental capacit[y]" to personally conduct their own defenses. *See* 554 U.S. at 177–78. It held that the

Constitution permits trial courts "to insist upon representation by counsel" for that class of criminal defendants—but it does not require a trial court to do so. *See id*. at 178 ("[T]he Constitution *permits* States to insist upon representation by counsel for those competent enough to stand trial under *Dusky* but who still suffer from mental illness to the point where they are not competent to conduct trial proceedings by themselves.") (emphasis added); *see also Fletcher v. State*, 474 S.W.3d 389, 400 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) ("Appellant asks us to hold that *Edwards* means not solely that a trial court may insist on representation for defendants who are incapable of conducting trial proceedings due to severe mental illness, but also that a trial court must do so. We disagree that *Edwards* so holds."); *United States v. Berry*, 565 F.3d 385, 391 (7th Cir. 2009) (Under *Edwards*, the "Constitution may have allowed the trial judge to block [the defendant's] request to go [at] it alone, but it certainly didn't require it.").

In this case, after Appellant invoked his right of self-representation but before he signed the waiver-of-counsel form, counsel filed a "Motion for Determination by an Expert of [Appellant's] Compentence [sic] *to Waive his Counsel and Proceed to Represent Himself* in his Trial for Capital Murder." (Emphasis added). Citing *Edwards*, counsel urged the trial court to "conduct a hearing out of the presence of the jury to appoint a qualified expert to determine if the Defendant is competent *to waive counsel and represent himself*." (Emphasis added). At a hearing on this motion, counsel denied that they were questioning Appellant's competence to stand trial. They only expressed doubts about whether Appellant had the mental capacity to proceed *pro se*.

In support of their motion, counsel offered an affidavit from Dr. Jolie Brams, a forensic and clinical psychologist whom the defense had originally hired to assist in preparing a mitigation case for the punishment phase of trial. Brams conceded that the defense had not originally hired her "to

address a specific legal issue, such as sanity or competency," and that she had not "administered any psychological testing to" Appellant. Even so, Brams claimed that her interactions with Appellant and his family, and her assessment of Appellant's "functioning over time," had raised "significant red flags regarding his competency to represent himself." And because, in Brams's view, there are "significant overlaps" between a defendant's capacity to represent himself and his competence to stand trial, Brams considered it "mandatory" that Appellant "undergo a competency evaluation, focusing both upon competency to proceed and competency to represent himself."

After hearing arguments for and against counsel's request for an expert to determine Appellant's competency to represent himself (including Appellant's insistence that he was competent and "capable of doing this"), the trial court remarked:

> THE COURT: Okay, great. I have read [Brams's] preliminary report. On its face it's pretty compelling. Without going into her reasons, with regard to the childhood trauma . . . she is not making an opinion regarding the Defendant's current competency to proceed, or his competency to represent himself. Instead, it is mandatory, in this opinion, that Mr. Falk undergo a competency evaluation, focusing both upon competency to proceed and competency to represent himself[.]

The trial court stayed the proceedings and appointed Dr. Mary Alice Conroy to gauge Appellant's competency.

Conroy eventually met with Appellant and concluded that he was "competent to stand trial and competent to determine if he should represent himself." A few days after Conroy submitted her report, the trial proceedings resumed. The trial court stated that it took "judicial notice" of Conroy's report, voiced its agreement with Conroy's assessment that Appellant was competent to stand trial, and accepted Appellant's waiver of counsel.

**A. The statutory requirement of a formal competency trial was not implicated in this case.**

In point of error five, Appellant argues that the trial court erred to find Appellant competent to stand trial without first holding a formal, contested competency trial under Chapter 46B, Subchapter C of the Code of Criminal Procedure. He invokes Article 46B.005(b), which says that, subject only to a single exception inapplicable here, a trial court "shall hold a trial under Subchapter C before determining whether the defendant is incompetent to stand trial on the merits."

Article 46B.005 contemplates that the need for a competency trial is triggered only if, "after an informal inquiry[,] the court determines that evidence exists to support a finding of incompetency." *See* Art. 46B.005(a), (b). In this case, the trial court never expressly determined that there was "some evidence [to] support a finding that the defendant may be incompetent to stand trial." *See* Art. 46B.004(c). After reviewing Brams's affidavit, the trial court ordered that Appellant be evaluated by an independent expert in regard to his competence to stand trial and capacity to represent himself, without stating whether it regarded Brams's affidavit as "some evidence" of possible incompetency to stand trial. Counsel also never sought or obtained a ruling on that point. Instead, counsel repeatedly emphasized that they were not calling his competency to stand trial into question—only his competency to represent himself. On these facts, we conclude that the statutory requirement of a formal competency trial was not triggered. *See* Art. 46B.005(b).

Appellant suggests that the fact that the trial court had Appellant evaluated in regard to his competence to stand trial is itself an indication that the trial court regarded Brams's affidavit as "some evidence" of incompetency. But a trial court may appoint an expert to "examine the defendant and report to the court on the competency or incompetency of the defendant" if there is even a "suggestion that the defendant may be incompetent to stand trial." *See* Art. 46B.021(a). Furthermore, "the fact that psychiatric examinations are ordered by a court does not constitute a

determination that an issue as to the defendant's competency exists." *See Johnson v. State*, 564 S.W.2d 707, 711 (Tex. Crim. App. 1978) (op. on reh'g), *overruled on other grounds by Williams v. State*, 663 S.W.2d 832, 834 (Tex. Crim. App. 1984). Under these facts, the trial court's appointment of an expert to gauge Appellant's competency to stand trial did not constitute a determination "after an informal inquiry" that some evidence existed to support a finding of incompetency. *See* Art. 46B.005(a). Appellant cannot show that the trial court ran afoul of Article 46B.005(b). Point of error five is overruled.

### B. The trial court did not violate due process by finding Appellant competent to stand trial without holding a contested hearing on that issue.

Appellant also argues that the federal constitutional guarantee of due process independently required the trial court to hold a formal hearing on the issue of competency. Appellant contends that Brams's affidavit, together with what he describes as his own "suicidal . . . actions," would have raised "a bona fide doubt in the mind of a reasonable observer about [his] competency" to stand trial. Thus, Appellant submits, due process imposed a duty on the trial court to call for a competency hearing *sua sponte*.

Appellant cites *Pate v. Robinson*, in which the Supreme Court held that states must provide adequate procedures to ensure that incompetent defendants are not put to trial. *See* 383 U.S. at 378; *see also Turner*, 422 S.W.3d at 689. Our statutory competency scheme was initially designed to "codify" *Pate*. *See Johnson*, 564 S.W.3d at 710. Since its adoption, through gradual amendments, that scheme has expanded a defendant's ability to adduce evidence, and ultimately prove in a formal hearing, that he is incompetent to stand trial. *See, e.g.*, *Turner*, 422 S.W.3d at 692; *see also Dix & Schmolesky*, 43B TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 31:2 (3d. ed. 2020).

Our statutory scheme thus goes beyond the minimal requirements of due process. So, because our statutory competency scheme was not violated in this case, no due process violation occurred.

Alternatively, to the extent that Appellant invokes the "bona fide doubt" standard, we have held that "[e]vidence raising a bona fide doubt is evidence that causes a real doubt in the judge's mind as to the defendant's competency." *See Mata v. State*, 632 S.W.2d 355, 358 (Tex. Crim. App. 1982). In this case, the trial court did not harbor a "real doubt" as to Appellant's competency. When the court decided to have Appellant evaluated by an independent expert, it expressly stated that it was "expect[ing] a finding of competency." The court elaborated, "I don't think he's incompetent or will be found incompetent, barring some huge surprise, but I'm doing it [appointing an independent expert to evaluate Appellant's competency] more for the record and for appearance[']s sake." So, even assuming that the "bona fide doubt" standard is a component of federal due process, the trial court did not err by failing to hold a formal competency hearing on these facts. Point of error six is overruled.

### C.  This case does not raise an *Edwards* issue.

In point of error seven, Appellant invokes *Indiana v. Edwards* to argue that the trial court "abused its discretion when it permitted [Appellant] to proceed *pro se* . . . without giving meaningful consideration to [Appellant's] diminished capacity to represent himself." We find no error in the trial court's decision to allow Appellant to represent himself. *Edwards* holds that the Constitution allows a trial court to appoint counsel to represent a defendant who appears to the trial court to lack sufficient mental capacity to represent himself. *Edwards*, 554 U.S. at 178. It does not require a trial court to do so. *See id.*; *see also Fletcher*, 474 S.W.3d at 400; *Berry*, 565 F.3d at 391. Because the trial court ultimately honored Appellant's right of self-representation, this case does not raise an

*Edwards* issue. Having determined that Appellant was competent to stand trial, the trial court did not violate the Constitution by granting Appellant's request to represent himself. *See Godinez v. Moran*, 509 U.S. 389, 399–400 (1993) ("Nor do we think that a defendant who waives his right to the assistance of counsel must be more competent than a defendant who does not, since there is no reason to believe that the decision to waive counsel requires an appreciably higher level of mental functioning than the decision to waive other constitutional rights."). Point of error seven is overruled.

## V. THE ROLE OF STANDBY COUNSEL

In points of error eight and nine, Appellant raises state and federal constitutional challenges to the restrictions that the trial court placed upon standby counsel. *See* TEX. CONST. art. I, § 10; U.S. CONST. amends. VI, XIV. Appellant argues that he should have been allowed to enjoy both his right of self-representation (as to the objectives and strategy of his defense) and his right to the assistance of learned counsel fully capable of lodging objections, questioning witnesses, making arguments, *et cetera*.

After Appellant invoked his right of self-representation, the trial court admonished Appellant as follows:

> THE COURT: Now the law allows me to appoint standby counsel with or without your agreement. Do you understand that, sir, and you have actually requested it?
>
> MR. FALK: I requested it, yes, sir.
>
> THE COURT: If I appointed standby counsel I would say to you that standby counsel is to be present in advisory capacity only; that you would have to make all the tactical decisions, that they may not question witnesses or speak on your behalf, that they may explain courtroom procedures and protocol and evidentiary predicates to you. Do you understand, sir?

MR. FALK: Yes, sir.

After jury selection but before Appellant pleaded guilty, the trial court entered a written order prohibiting standby counsel from asking "any questions of any witness" or making "any objections to any trial procedure" while in the "presence and hearing of the Jury." The court likewise prohibited counsel from "do[ing] any act or tak[ing] any action that would interfere with or affect the perception by the jury that" Appellant was representing himself. *See McKaskle v. Wiggins*, 465 U.S. 168, 178 (1984) ("[P]articipation by standby counsel without the defendant's consent should not be allowed to destroy the jury's perception that the defendant is representing himself."). Appellant did not object to these restrictions when they were imposed.

On appeal, Appellant contends that these restrictions violated his state constitutional right "of being heard by himself or counsel, or both," *see* TEX. CONST. art. I, § 10, and his federal constitutional right to the assistance of counsel. *See* U.S. CONST. amend. VI. In effect, Appellant argues that both the Texas Constitution and the United States Constitution guarantee a right of "hybrid representation."

In *Landers v. State*, we held that there is no "constitutional right in Texas to hybrid representation," by which we meant representation "partially pro se and partially by counsel." *See* 550 S.W.2d 272, 280 (Tex. Crim. App. 1977) (op. on reh'g). Appellant argues on several bases that we ought to "reconsider" our holding in *Landers*, but Appellant did not assert any of those bases at trial. Neither did Appellant object that the trial court's restrictions on standby counsel were inconsistent with the Sixth Amendment right to the "assistance of counsel."

While a trial court has some discretion to afford a criminal defendant the kind of hybrid representation that Appellant argues for in points of error eight and nine, *see Scarbrough v. State*,

777 S.W.2d 83, 92 (Tex. Crim. App. 1989) (citations omitted), Appellant did not clearly and unequivocally inform the trial judge that he believed himself entitled to hybrid representation, either on state or federal constitutional grounds. We therefore decline to revisit our holding in *Landers v. State* that Article I, Section 10 of the Texas Constitution does not guarantee a right of hybrid representation. *See Landers*, 550 S.W.2d at 280. And we decline to review Appellant's argument that the Sixth Amendment guarantees a right of hybrid representation. *But see McKaskle*, 465 U.S. at 183 ("*Faretta* does not require a trial judge to permit 'hybrid' representation[.]"). Points of error eight and nine are overruled.

## VI.  JUDICIAL COMMENTS IN JURY SELECTION

In points of error sixteen and seventeen, Appellant complains on statutory and constitutional grounds that the trial judge made prejudicial comments during jury selection. *See* Art. 38.05; U.S. CONST. amend. VIII.

During jury selection, Appellant invoked his right of self-representation in the middle of the questioning of individual jurors. Therefore, some of the prospective jurors went through individual *voir dire* with the understanding that Appellant would be represented by counsel at trial, while others were told that Appellant would represent himself. To avoid any confusion, and to dispel any possible perception that Appellant's lawyers had been "fired" midway through jury selection, the trial judge thought it best to inform the prospective jurors that Appellant had invoked his constitutional right of self-representation. Appellant initially questioned whether this was necessary, but ultimately did not object to the trial judge's decision to inform the jurors about this change. The trial judge informed each prospective juror that Appellant had made a "rational," "reasonable," or "reasoned" decision (the precise wording varied from juror to juror) to represent himself, in

accordance with his constitutional right to do so.

Appellant contends that these comments signaled to the jurors that Appellant was in all respects fully "rational" and thus capable of sound "reason[ing]." Appellant argues that, if the jurors understood the trial judge's comments that way, they would have been more likely to infer that Appellant participated in the underlying capital murder with a clear mind and a level head. Appellant contends that this inference would logically bear on all three of the punishment-phase special issues.

### A. The trial judge's comments did not violate Article 38.05.

In point of error sixteen, Appellant invokes Article 38.05, which provides:

In ruling upon the admissibility of evidence, the judge shall not discuss or comment upon the weight of the same or its bearing in the case, but shall simply decide whether or not it is admissible; nor shall he, at any stage of the proceeding previous to the return of the verdict, make any remark calculated to convey to the jury his opinion of the case.

We have held that a judicial comment violates Article 38.05 if it is "reasonably calculated to benefit the State or prejudice the defendant's rights." *See Proenza v. State*, 541 S.W.3d 786, 791 (Tex. Crim. App. 2017) (citations omitted). Appellate claims brought under Article 38.05 are not subject to procedural default. *Id.* at 802.

In this case, the trial judge's comments were made before any specific item of evidence was offered, elicited, or alluded to. So, as far as the first, ruling-upon-evidence clause of Article 38.05 is concerned, we find no error in the trial judge's remarks. *See* Art. 38.05 ("In ruling upon the admissibility of evidence, the judge shall not discuss or comment upon the weight of the same or its bearing in the case[.]"). As for the second, opinion-of-the-case clause, there is no reason to think that the jurors might have regarded the trial judge's comments about Appellant's "rational" decision

to represent himself as indicative of the judge's opinion of "the case" generally. The greater likelihood is that the jurors understood the trial judge's comments to extend no further than the context in which they were offered, *i.e.*, Appellant's decision to represent himself.

The logical connection between the lucidity of Appellant's decision to represent himself and his mental state during the alleged offense is tenuous. The same goes for the connection between the trial court's comments and the issue of whether Appellant would pose a continuing threat to society and whether a death sentence was appropriate in light of any mitigating circumstances. We conclude that the trial judge's comments were not reasonably calculated to benefit the State or prejudice Appellant's rights. Point of error sixteen is overruled.

**B. The trial judge's comments did not violate the Eighth Amendment.**

In point of error seventeen, Appellant invokes two distinct Eighth Amendment concepts in support of his claim that the trial judge's comments poisoned the case. In an abundance of caution, we will assume without deciding that Appellant may invoke these concepts for the first time on appeal. First, Appellant invokes the Eighth Amendment principle that "every capital sentencer must be free to weigh relevant mitigating evidence before deciding whether to impose the death penalty." *See Turner v. Murray*, 476 U.S. 28, 34 (1986) (citations omitted). Appellant concedes that the Supreme Court has most often applied this principle in the context of jury instructions. *See, e.g.*, *Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007); *Hitchcock v. Duffer*, 481 U.S. 393 (1987). But he argues that it ought to apply any time a trial court's comments downplay the potentially mitigating value of evidence in front of the jury.

We disagree that the trial judge's comments kept the jury from giving meaningful effect to mitigating evidence in violation of the Eighth Amendment. *See Eddings v. Oklahoma*, 455 U.S 104,

112 (1982). The "evidence" that Appellant accuses the trial judge of minimizing in front of the jury is the fact that Appellant "cho[se] to passively accept a death sentence." But the reasonableness of a litigant's strategic decisions is not "evidence"—it is not an exhibit or testimonial statement that the jury, as factfinder, is free to credit or discredit. *See* Art. 37.071, § 2(e)(1) (stating that, in deciding the mitigation special issue, the jury should "tak[e] into consideration all of the *evidence*") (emphasis added). Furthermore, Appellant mischaracterizes the trial judge's remarks. The trial judge did not state or even suggest to the jurors that Appellant intended to "passively accept a death sentence," much less that Appellant's intentions in that regard were "reasonable" or "rational." The trial judge assured the jurors that Appellant's decision to invoke his constitutional right of self-representation was reasonable and rational. This assurance did not preclude the jury from inferring—from actual evidence—that Appellant suffered from an underlying psychological condition and treating that condition as a mitigating circumstance in the punishment phase of trial.

Appellant also invokes the Eighth Amendment principle that it is "impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." *See Caldwell v. Mississippi*, 472 U.S. 320, 328–29 (1985). Appellant concedes that this rule originated in a capital case in which the prosecutor, not the trial court, suggested to the jury that its role in the sentencing process was non-determinative. *See id.* at 325. But he argues that it ought to apply with equal, if not greater, force on these facts, because jurors put more stock in a trial judge's impartial guidance than they do in a prosecutor's partisan arguments. *Cf. Ward v. State*, 243 S.W.2d 695, 697 (Tex. Crim. App. 1951) ("Juries are given to having great respect for the presiding judge in a case in which they are called to serve.").

In this case, the trial judge's comments did not "reduc[e] the jurors' sense of responsibility for their sentencing verdict," in violation of *Caldwell*. Appellant argues that the trial judge effectively assured the jurors that they need not have any reservations about potentially condemning a mentally infirm person to death—that Appellant was perfectly "rational." Appellant mischaracterizes the trial judge's comments. The trial judge assured the jurors that Appellant's decision to represent himself was reasonable and rational. These remarks did not "mislead the jury as to its role in the sentencing process" at all, much less "in a way that allow[ed] the jury to feel less responsible than it should for the sentencing decision." *See Dugger v. Adams*, 489 U.S. 401, 407 (1989). The judge's comments did not imply that Appellant's fate would be determined by anyone but the jurors. Point of error seventeen is overruled.

## VII. THE IMPANELED JURY

In points of error four and eighteen, Appellant argues on two legal bases that the trial court erred to impanel the jury as constituted.

### A. The trial court had no duty to initiate a *Batson* inquiry *sua sponte*.

In point of error four, Appellant alleges that the State's peremptory strikes showed a pattern of race- and gender-based discrimination, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986) (holding that the Equal Protection Clause forbids race-based peremptory strikes), and *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127 (1994) (holding that the Equal Protection Clause forbids gender-based peremptory strikes). In support of this claim, Appellant points to the facts that (1) "of the State's 13 peremptory strikes, 10 were exercised against women," and (2) "[t]he State . . . exercised two peremptory challenges to exclude the only two African-American prospective jurors in the qualified venire that were reached by the parties during jury selection."

The Supreme Court has interpreted the Equal Protection Clause to require that, at a minimum, trial courts adhere to the following three-step protocol for resolving a claim that the State used its peremptory strikes in a discriminatory fashion:

> First, a defendant must make a *prima facie* showing that a peremptory challenge has been exercised on the basis of race; second, if that showing has been made, the prosecution must offer a race-neutral basis for striking the juror in question; and third, in light of the parties' submissions, the trial court must determine whether the defendant has shown purposeful discrimination.

*Snyder v. Louisiana*, 552 U.S. 472, 476–77 (2008) (internal quotation marks and brackets omitted) (quoting *Miller-El v. Dretke*, 545 U.S. 231, 277 (2005) (Thomas, J., dissenting)). Appellant acknowledges that, at trial, he did not attempt to make a *prima facie* showing of race- or gender-based discrimination in the State's use of its peremptory strikes. Nevertheless, Appellant maintains that he is permitted to raise this issue for the first time on appeal because there are times when a trial court has an affirmative duty to enforce *Batson*'s holding *sua sponte*.[4]

Appellant characterizes this as an issue of first impression; however, in *Mathews v. State*, we held that "under the caselaw of this State, appellant may not raise *Batson* error for the first time on appeal, when there is nothing in the record which would allow him to show purposeful discrimination, or even an objection." 768 S.W.2d 731, 733 (Tex. Crim. App. 1989). And in *Batiste v. State*, we reaffirmed that "*Batson* error is subject to principles of ordinary procedural default." 888 S.W.2d 9, 17 n.5 (Tex. Crim. App. 1994) (citing *Mathews*, 768 S.W.2d at 275). Thus, the "failure to object to prosecutorial use of peremptory challenges to exclude veniremen on the basis of race before the jury is sworn forfeits a defendant's chance to obtain a hearing at which the

---

[4]For brevity's sake, we will use the style *Batson* to encompass both race- and gender-based discrimination in the State's use of its peremptory strikes.

prosecutor can offer race-neutral explanations to rebut his prima facie case, if any, of purposeful discrimination." *Id.* This necessarily means that when a defendant does not raise a *Batson* objection at trial, the trial court has no *sua sponte* duty to demand race- or gender-neutral explanations for the State's peremptory strikes. *Cf. Mendez v. State*, 138 S.W.3d 334, 342 (Tex. Crim. App. 2004) ("A law that puts a duty on the trial court to act *sua sponte*, creates a right that is waivable only. It cannot be a law that is forfeitable by a party's inaction.").

Appellant urges us to either (1) reconsider *Mathews* and *Batiste* in light of the unique interests at stake in the *Batson* context or (2) make an exception to the ordinary rules of procedural default that would apply only to the kinds of "unusual circumstances presented here."

Appellant argues primarily that *Mathews* and *Batiste* should be reconsidered because those cases pay insufficient heed to the rights of venirepersons to participate in the justice system free of any race- or gender-based discrimination. But *Batson* itself and even *Batson*'s primary predecessor noted the unique harm that is inflicted upon a venireperson's right to participate in the justice system whenever she is stricken from the panel on account of race. *See Batson*, 476 U.S. at 87 ("[B]y denying a person participation in jury service on account of his race, the State unconstitutionally discriminate[s] against the excluded juror.") (citations omitted); *Swain v. Alabama*, 380 U.S. 202, 203–04 (1965) ("[A] State's purposeful or deliberate denial to Negroes on account of race of participation as jurors in the administration of justice violates the Equal Protection Clause."). But the Court has continuously insisted that the party accusing its adversary of race- or gender-based discrimination bears the initial burden of producing *prima facie* evidence of that discrimination. *See, e.g., Flowers v. Mississippi*, 139 S. Ct. 2228, 2241 (2019); *Snyder*, 552 U.S. at 476–77; *J.E.B.*, 511 U.S. at 144–45.

Appellant also argues that, if we do not overrule *Mathews* and *Batiste* across the board, we should at least recognize an exception to the ordinary rules of procedural default under the "unusual circumstances presented here." The "unusual circumstances" Appellant refers to are the facts that, at trial: (1) Appellant represented himself; (2) Appellant "was affirmatively attempting to help the State convict him and condemn him to death[;]" and (3) "the pattern of improper strikes was manifest." None of these circumstances justify creating an exception to the rule that *Batson* claims are subject to forfeiture. Were we to carve out an exception to the ordinary rules of procedural default for *pro se* defendants, or defendants who refused to subject the State's case to meaningful adversarial testing, we would provide an incentive for future defendants to chart the same risky course that Appellant did. We decline to create an incentive that, on balance, we think would cause more harm than it prevented. *Cf. Batson*, 476 U.S. at 99 n.24 ("In light of the variety of jury selection practices followed in our state and federal trial courts, we make no attempt to instruct these courts how best to implement our holding today.").

Finally, Appellant's contention that the pattern of discrimination in this case was "manifest" is not an argument for carving out an exception to the rules of procedural default. It is an argument on the merits of the very complaint whose availability on appeal is now in dispute. We have previously disavowed this kind of merits-based approach to issues of procedural default. *See Proenza*, 541 S.W.3d at 796 ("[A] proper determination of a claim's availability on appeal should not involve peering behind the procedural-default curtain to look at the particular circumstances of the claim within the case at hand.") (internal quotation marks omitted). If a particular class of trial court error is subject to procedural default, then, with very few exceptions, the egregiousness of the alleged error does not transform it into one that is immune from procedural default. *See id.* And

neither we nor the Supreme Court have ever held that there is a point at which a party's peremptory strikes can become so "manifest[ly]" discriminatory that the other party is relieved of the burden of making a *prima facie* case of discrimination.

We conclude that a trial court has no duty to initiate a *Batson* inquiry in the absence of an objection or request.[5]  Point of error four is overruled.

## B.  Appellant forfeited his complaints about juror eighty-nine.

In point of error eighteen, Appellant argues that the trial court violated the Sixth and Fourteenth Amendments by allowing a biased juror, whom he identifies as juror eighty-nine, to serve on the jury.  Appellant admits that he did not challenge juror eighty-nine, either for cause or by using one of his peremptory strikes.  Appellant also acknowledges that, at least ordinarily, "parties are expected to object if they perceive a juror not to be legally qualified to serve."  Nevertheless, Appellant argues that, under the Sixth and Fourteenth Amendments, trial by an impartial jury "is not an option" that the parties can choose, or choose not, to abide by.  *Contra State v. Morales*, 253 S.W.3d 686, 697 (Tex. Crim. App. 2008) ("We have held that the right to trial by an impartial jury, like any other right, is subject to waiver (or even forfeiture) by the defendant in the interest of overall trial strategy.") (citations omitted).  So, Appellant argues, juror eighty-nine's alleged bias having been "actually known to the trial court," the Sixth and Fourteenth Amendments demanded that the trial court intervene.

None of the cases Appellant cites stands for the proposition that, when it comes to a

---

[5]  We need not, and so do not, decide whether a trial court has discretion to initiate a *Batson* inquiry in the absence of an objection or request.  Contrary to what Appellant argues, even if we were to hold that trial courts retain the discretion to initiate a *Batson* inquiry *sua sponte*, such a holding from this Court would not constitute grounds for abating this appeal and remanding the case to the trial court.

defendant's right to an impartial jury, the Sixth and Fourteenth Amendments override state law procedural rules requiring a timely objection. Further, our numerous decisions holding that any claim of trial court error in seating a biased juror must be preserved at trial by a timely objection or motion to strike for cause undermine Appellant's arguments. *See, e.g.*, *Morales*, 253 S.W.3d at 697 (citing *Delrio v. State*, 840 S.W.2d 443, 445 (Tex. Crim. App. 1992)). Point of error eighteen is overruled.

## VIII. VALIDITY OF THE GUILTY PLEA

In points of error ten through fourteen, Appellant raises an assortment of challenges to the process by which he was permitted to plead, and was ultimately found, guilty of capital murder.

After the jury was impaneled, and in the jury's presence, the trial court directed the State to read the indictment aloud. When this was done, the trial court asked Appellant to enter a plea. Appellant orally pleaded "guilty to the charges." The trial court then excused the jury so that the court could review a guilty plea memorandum with Appellant. This memorandum contained various admonishments, statements, and waivers related to Appellant's guilty plea, as well as a stipulation of evidence. Appellant affirmed, orally and in writing, that he understood everything in the memorandum, that he was signing it "freely, knowingly, and voluntarily," and that its contents were true.

By signing the guilty plea memorandum, Appellant expressly waived his right "to have a jury determine guilt or innocence in this case." He affirmed that he had "read the indictment," and he admitted that he had "committed each and every element . . . on the date alleged" therein. He stipulated that, "acting alone or as a party," he had intentionally or knowingly caused Canfield's death, and that he did so while escaping or attempting to escape from a penal institution.

The trial court accepted Appellant's plea and pronounced him guilty of capital murder. It did not submit the issue of Appellant's guilt to the jury. After finding Appellant guilty, the trial court brought the jury back into the courtroom and stated: "I have found Mr. Falk guilty, accepted his plea, and, in essence, he stands now convicted of capital murder[.]" The trial then immediately proceeded to the punishment phase.

**A. Appellant has not shown that his guilty plea was involuntary.**

In point of error ten, Appellant argues that the record fails to establish that his guilty plea was knowingly, voluntarily, and intelligently entered, in violation of his federal constitutional right to due process.

For a guilty plea to comport with due process, it must be "voluntary in the sense that it constitute[s] an intelligent admission that [the defendant] committed the offense" in question. *See, e.g.*, *Henderson v. Morgan*, 426 U.S. 637, 645 (1976).[6] The Supreme Court has "long held that a plea does not qualify as intelligent unless a criminal defendant first receives 'real notice of the true nature of the charge against him, the first and most universally recognized requirement of due process.'" *Bousley v. United States*, 523 U.S. 614, 618 (1998) (quoting *Smith v. O'Grady*, 312 U.S. 329, 334 (1941)). Due process thus "impos[es] a duty on the trial court to make the record demonstrate the knowing and voluntary quality of a guilty plea." *Davison v. State*, 405 S.W.3d 682,

---

[6] A guilty plea may be involuntary either because (1) "the accused does not understand the nature of the constitutional protections that he is waiving," or because (2) "he has such an incomplete understanding of the charge that his plea cannot stand as an intelligent admission of guilt." *Henderson*, 426 U.S. at 637 n.13. Appellant expressly declines to argue that his plea was involuntary in the first sense.

690 (Tex. Crim. App. 2013) (citations omitted).[7] If the trial court fails to carry out its duty in this regard, a reviewing court must presume that the defendant's plea was involuntary "and rule accordingly." *Id.* (citations omitted).

A trial court ordinarily satisfies its duty in this regard by providing the defendant with a copy of the indictment. *See Bousley*, 523 U.S. at 618; *see also Lincoln v. State*, 560 S.W.2d 657, 659 (Tex. Crim. App. 1978). If the record reveals that the trial court furnished the defendant with a copy of the indictment, the presumption of involuntariness reverses, becoming a presumption of voluntariness. "Such circumstances, standing alone, give rise to a presumption that the defendant was informed of the nature of the charge against him." *Bousley*, 523 U.S. at 618 (citations omitted).

"The presumption of a constitutionally voluntary plea may, of course, be rebutted." *Mitschke v. State*, 129 S.W.3d 130, 135 (Tex. Crim. App. 2004). But because this presumption tilts toward voluntariness, the appellant, and not the State, assumes the risk of nonpersuasion. *See State v. Kelly*, 204 S.W.3d 808, 819 (Tex. Crim. App. 2006) ("[T]he party with the burden of proof assumes the risk of nonpersuasion."). If this presumption applies, it will not suffice for Appellant to show that the record is silent in regard to his understanding of the charge. To overcome the presumption of voluntariness, Appellant would need to marshal some evidence, or at least point to some indication in the record, affirmatively demonstrating that he did not understand the charge. *See Davison*, 405 S.W.3d at 692 & n.60; *see also Bousley*, 523 U.S. at 618–19.

Appellant acknowledges that the State read the indictment to him before he pleaded guilty.

---

[7] We have held that a due process claim "that the record is absolutely unrevealing with respect to whether a guilty plea was entered intelligently" is not subject to ordinary principles of procedural default. *Davison*, 405 S.W.3d at 690 (citations omitted). Such a claim may be raised, as it was here, for the first time on appeal. *See id.*

Appellant nevertheless contends that the presumption of voluntariness should not apply in this case, because this case centered around the law of parties. The law of parties, Appellant argues, "is notoriously confusing and complicated, even for judges and lawyers." Thus, Appellant asserts, it is "impossible to conclude from a silent record that a layperson" like himself "possessed an adequate understanding of this doctrine or how it applied to the facts of his case." Appellant also argues that the record does not adequately evince the voluntary nature of his plea because the trial court failed to apprise him of any "viable defenses to the charge."

Neither the Supreme Court nor this Court has held that due process requires a trial court to explain the intricacies of an implicated legal doctrine to a defendant before the court may accept the defendant's plea. There is "no rule requiring the court to instruct the accused on every aspect of the law pertinent to the case when the accused pleads guilty." *Rose v. State*, 465 S.W.2d 147, 149 (Tex. Crim. App. 1971). It may be incumbent upon defense counsel to explain applicable legal doctrines to a client before the client pleads guilty. *See, e.g.*, *Ex parte Lewis*, 537 S.W.3d 917, 922–23 (Tex. Crim. App. 2017). But even so, that requirement arises from the Sixth Amendment right of effective assistance of counsel, not the Fifth or Fourteenth Amendment right to due process. Appellant waived the right to constitutionally effective counsel, and "[i]t is not the court's function to act as legal counsel for the appellant." *Rose*, 465 S.W.2d at 149. The trial court satisfied its duty to ensure that Appellant received "real notice of the true nature of the charge against him," *See Bousley*, 523 U.S. at 618 (citations omitted), by providing Appellant a copy of the indictment. The presumption of voluntariness applies.[8]

---

[8] In a post-submission brief, Appellant cites *Weeks* for the proposition that "[p]arty liability is as much an element of an offense as the enumerated elements prescribed in a statute that defines a particular crime." *See* 391 S.W.3d at 124. Thus, Appellant argues, by failing to

Because of this, Appellant's claim necessarily fails. The only record-based indications that Appellant marshals in support of this claim concern what the trial court supposedly failed to do. That is not affirmative evidence of ignorance; it is Appellant pointing to a silent or underdeveloped record in support of a claim on which he carries the burden. A silent record does not rebut the presumption of voluntariness. *But see Davison*, 405 S.W.3d at 692 n.60 (noting that the court's holding would not prevent the appellant from obtaining relief in a habeas proceeding based on evidence outside of the appellate record). Point of error ten is overruled.

**B. There was a sufficient factual basis to support Appellant's guilty plea.**

In points of error eleven and twelve, Appellant complains that there was an insufficient factual basis for his guilty plea. In point of error eleven, Appellant invokes Article 1.15. In point of error twelve, Appellant again invokes his federal constitutional right to due process.

Article 1.15 dictates that, in guilty plea cases, "it shall be necessary for the state to introduce evidence into the record showing the guilt of the defendant and said evidence shall be accepted by the court as the basis for its judgment and in no event shall a person charged be convicted upon his plea without sufficient evidence to support the same." In short, "Article 1.15 requires substantiation of a guilty plea." *Menefee v. State*, 287 S.W.3d 9, 14 (Tex. Crim. App. 2009). A written judicial confession is sufficient by itself to substantiate a guilty plea under Article 1.15, *see, e.g.*, *Cevalles v. State*, 513 S.W.2d 865, 866 (Tex. Crim. App. 1974), so long as the confession "embraces every constituent element of the offense" in question. *Menefee*, 287 S.W.3d at 13 (citations omitted).

---

explain the law of parties, the trial court failed to provide Appellant with notice of an applicable "element" of capital murder. But *Weeks* made this statement in the context of the hypothetically correct jury charge, and we have never held that, for a guilty plea to comport with due process, the trial court must provide notice of the charge that resembles what would appear in the hypothetically correct jury charge.

In this case, Appellant executed the following written judicial confession (or self-styled "stipulation of evidence"):

> I stipulate and admit that on or about the 24th day of September, 2007 in Walker County, Texas, I did then and there, acting alone or as a party, intentionally or knowingly cause the death of an individual, namely, Susan Canfield, by striking her or the horse she was riding with a vehicle, and the defendant was then and there escaping or attempting to escape from a penal institution, to-wit: Texas Department of Criminal Justice Wynne Unit.

Appellant first argues that "the State has never contended and there is no evidence that [Appellant] 'acted alone' in this case; therefore, that language cannot provide a factual basis for [Appellant's] conviction." Then, Appellant argues that "the State has never contended and there is no evidence that [Appellant] caused the death of Officer Canfield by striking her or the horse she was riding with a truck; so that language similarly cannot provide a factual basis for his conviction." Thus, Appellant says, "the language of the stipulation reduces to an allegation that [Appellant], 'acting . . . as a party,' was responsible for acts committed not by him but by Mr. Martin that resulted in Officer Canfield's death."

We have found no support in the caselaw for Appellant's argument that, if the State "never contend[s]" that a defendant is guilty under one of multiple theories of guilt, each of which was stipulated to in the alternative, that theory must be stricken from the stipulation for purposes of guilty plea substantiation. Furthermore, Appellant's assertion that "there is no evidence that" Appellant acted alone, or that Appellant struck Officer Canfield with a truck, overlooks the fact that the written stipulation is itself evidence. *See Menefee*, 287 S.W.3d at 13; *Cevalles*, 513 S.W.2d at 866. Appellant has thus failed to provide any legal justification for striking the manner and means of Canfield's murder from the stipulation. Our only task, then, is to ensure that the stipulation as

executed embraces every constituent element of capital murder.

We conclude that it does. Appellant stipulated that he "intentionally or knowingly caused the death of an individual," *see* TEX. PENAL CODE § 19.02(b)(1); that the individual whose death he caused was Susan Canfield, the same individual named in the indictment; that, even if "as a party," he caused Canfield's death by the same manner and means as alleged in the indictment; and that he committed the murder while "escaping or attempting to escape from a penal institution." *See id.* § 19.03(a)(4). No constituent element of capital murder under Penal Code Section 19.03(a)(4) is missing from Appellant's stipulation. The stipulation is therefore sufficient under Article 1.15 to substantiate Appellant's plea.

This observation also disposes of Appellant's constitutional claim. We have held on more than one occasion that the United States Constitution "does not require that the State present evidence in support of a guilty plea in Texas courts." *E.g.*, *Menefee*, 287 S.W.3d at 13 (citing *Ex parte Williams*, 703 S.W.2d 674, 682 (Tex. Crim. App. 1986)). The requirement that trial courts insist upon evidentiary substantiation before accepting a guilty plea is purely a creature of state law; it has no federal constitutional grounding. *See Williams*, 703 S.W.2d at 682.

Appellant cites *North Carolina v. Alford*, 400 U.S. 25, 37–38 (1970), for the proposition that there are some circumstances under which due process compels a trial court to inquire into the factual basis of a guilty plea before accepting it. In *Alford*, the Court condoned as consistent with due process a guilty plea in which the defendant repeatedly insisted that, despite his plea, he was innocent. *Id.* at 38–39. Part of the Court's stated reasoning was that "the record before the [trial] judge contain[ed] strong evidence of actual guilt." *Id.* at 37–38. Appellant thus understands *Alford* to hold that any time the reliability of a guilty plea is brought into question, by protestation of

innocence or otherwise, the Constitution requires the trial court to ascertain the existence of a factual basis for the plea—and, if it finds that basis lacking, to reject the plea.

However, Appellant's judicial confession was evidence. *See, e.g.*, *Menefee*, 287 S.W.3d at 13. Even if Appellant is correct, the evidence in this case satisfies his due process concerns. Appellant pleaded guilty, did not object when the State offered evidence in support of that plea, and did not assert his innocence. There was no "factual and legal dispute between him and the State." *See Alford*, 400 U.S. at 32. Points of error eleven and twelve are overruled.

### C. The lack of a written jury verdict on guilt was harmless.

In point of error thirteen, Appellant argues that, by statute, a conviction cannot be had in a death penalty case except by "the verdict of a jury duly rendered and recorded." *See* Arts. 1.13–1.15. In this proceeding, the jury did not "render[]" a guilty verdict—Appellant pleaded guilty and the trial court pronounced him guilty without submitting the issue of his guilt to the jury. Appellant thus contends that he was convicted of capital murder in violation of Articles 1.13, 1.14, and 1.15, rendering his capital murder conviction a nullity.

Article 1.15 provides, in relevant part: "No person can be convicted of a felony except upon the verdict of a jury duly rendered and recorded, unless the defendant, upon entering a plea, has in open court in person waived his right of trial by jury in writing in accordance with Articles 1.13 and 1.14." In turn, Article 1.13(b) provides: "In a capital felony case in which . . . the State notifies the court and the defendant that it will not seek the death penalty, the defendant may waive the right to trial by jury." This provision does not expressly state whether, if the State *is* seeking the death penalty, the defendant may waive his right of trial by jury. But Article 1.14(a) arguably fills the gap: "[A] defendant in a capital felony case may waive the right of trial by jury only in the manner

permitted by Article 1.13(b) of this code." Taken together, we understand these provisions to mean that, if the State is seeking the death penalty, the defendant may not waive a jury trial. *See Fuller v. State*, 253 S.W.3d 220, 226 (Tex. Crim. App. 2008) ("Because the State sought the death penalty . . . the appellant was required to be tried by a jury."). Appellant's point is that, because the State sought the death penalty in this case, any waiver of the right to jury trial that Appellant purported to execute could not possibly have been "in accordance with Articles 1.13 and 1.14." So, Appellant argues, the "unless" provision of Article 1.15 did not apply—the general rule requiring jury verdicts in a felony cases did.

Appellant acknowledges that, in *Fuller v. State*, we held that "a [jury] verdict on the guilt of a person who pleads guilty is not necessary, *even in a capital case*." 253 S.W.3d at 227 (emphasis added) (citing *Brinson v. State*, 570 S.W.2d 937, 938–39 (Tex. Crim. App. 1978)). But Appellant argues that we should reconsider our holding in *Fuller* because it "fail[s] to give due regard to Article 1.15's requirement of a jury verdict."

It is true that we did not discuss Article 1.15 in *Fuller*—if only because the appellant in *Fuller* invoked Article 1.13, not Article 1.15, in support of his claim that the Code of Criminal Procedure requires jury verdicts in death penalty cases. *See Fuller*, 253 S.W.2d at 225. In any event, we will assume without deciding that Appellant's reading of Articles 1.13, 1.14, and 1.15 is correct and that the trial court erred to enter a judgment of conviction for capital murder against Appellant in the absence of "the verdict of a jury duly rendered and recorded." *See* Art. 1.15. Even assuming error, Appellant has not shown he was harmed.

Appellant argues that this error is immune to harmless error analysis. "The issue," Appellant says, "is not whether [Appellant's] conviction should be upheld notwithstanding error in the

proceeding. The issue is that [Appellant] was never duly convicted." And "[w]ithout a conviction, there is nothing to which harmless error analysis may be applied."

We disagree. "Except for certain federal constitutional errors labeled by the United States Supreme Court as 'structural,' no error, whether it relates to jurisdiction, voluntariness of a plea, or any other mandatory requirement, is categorically immune to a harmless error analysis." *Cain*, 947 S.W.2d at 264. And as far as the United States Constitution is concerned, "[a] plea of guilty . . . is itself a conviction. Like a verdict of a jury, it is conclusive. More is not required; the court has nothing to do but give judgment and sentence." *Williams*, 703 S.W.2d at 682 (quoting *Kercheval v. United States*, 274 U.S. 220, 223 (1927)). Any requirement that there must be a jury verdict on guilt in death penalty cases, even when the defendant pleads guilty to the underlying capital murder charge, is a creature of state law. The violation of any such requirement would not be a "federal constitutional error," much less one that has been "labeled by the United States Supreme Court as structural." *See Cain*, 947 S.W.2d at 264. Any error in this regard is therefore subject to harm analysis. *See Williams v. State*, 273 S.W.3d 200, 225 (Tex. Crim. App. 2008).

Appellant invokes only statutory provisions in this point of error, so the "non-constitutional" harmless error standard applies. *See, e.g., Gray v. State*, 159 S.W.3d 95, 98 (Tex. Crim. App. 2005). We proceed to inquire whether this putative error affected Appellant's "substantial rights." *See* Rule 44.2(b). And, under this standard, we conclude that any error was harmless. Although the jury did not render a verdict on Appellant's guilt, it did receive his guilty plea in open court, and it rendered a verdict on the punishment phase special issues. *See* Art. 37.071, §§ 2(b), (e). That being the case, Appellant in fact received a jury trial, despite his purporting to waive that right. *See, e.g., Williams*, 674 S.W.2d at 319.

Furthermore, we are confident that the outcome of the trial would have been exactly the same if the trial court had instructed the jury to render a verdict following Appellant's plea. Point of error thirteen is overruled.

**D. Because Appellant received a jury trial, any error in allowing him to waive his right to a jury trial was harmless.**

In point of error fourteen, Appellant argues that Articles 1.13 and 1.14 prohibited the trial court from accepting Appellant's jury trial waiver. As previously mentioned, Articles 1.13 and 1.14 arguably suggest that in a capital case in which the State has not abandoned the death penalty, the defendant may not waive his right of trial by jury. *See Fuller*, 253 S.W.3d at 226. In this case, the guilty plea memorandum that Appellant signed included an express waiver of the right of trial by jury as to the guilt phase of trial. Appellant thus contends that Articles 1.13 and 1.14 were violated when the trial court accepted this purported waiver.

As we have already noted, by pleading guilty in front of the jury and receiving a jury verdict on the punishment phase special issues, Appellant in fact received a jury trial in contemplation of Articles 1.13 and 1.14. *See, e.g.*, *Williams*, 674 S.W.2d at 319; *see also Matchett v. State*, 941 S.W.2d 922, 931 (Tex. Crim. App. 1996) (plurality op.). So even if the trial court erred to accept Appellant's purported waiver of his right to a jury trial as to the guilt phase of trial, any error in this regard was harmless. *See* Rule 44.2(b). Appellant received the very thing that he construes Articles 1.13 and 1.14 to mandate in capital cases: a jury trial.

Appellant rejects our prior decisions holding that a guilty plea in front of a jury constitutes "trial by jury" in contemplation of Articles 1.13 and 1.14, but he does not ultimately show that our understanding of that phrase conflicts with the text of the statutes. He invokes "common sense" and

"plain meaning," but Articles 1.13 and 1.14 do not plainly foreclose an understanding of "trial by jury" that includes pleading guilty in front of a jury. He discusses the statutory history of Article 1.14, but we have held that "the statutory history does not demonstrate that the proscription against jury waiver in Art[icle] 1.14, in any of its stages, has ever prevented a defendant from pleading guilty to a jury." *Williams*, 674 S.W.2d at 318. Absent some showing that our established understanding of the phrase "trial by jury" was poorly reasoned from the outset or has become unworkable in practice, we need not revisit our prior holdings in this regard. *See, e.g.*, *Febus v. State*, 542 S.W.3d 568, 575–76 (Tex. Crim. App. 2018) (observing that we "do not frivolously overrule established precedent," but that we may do so when "a prior decision was poorly reasoned or unworkable") (citations omitted). Point of error fourteen is overruled.

## IX. THE PENALTY PHASE AND THE EIGHTH AMENDMENT

In points of error fifteen, nineteen, and twenty, Appellant argues that his death sentence violates the Eighth Amendment to the United States Constitution.

### A. The trial court did not violate the Eighth Amendment by allowing Appellant to represent himself in the penalty phase of trial.

In point of error fifteen, Appellant argues that the trial court violated the Eighth Amendment by allowing him to represent himself during the punishment phase of trial, despite it being obvious by that point that Appellant had no intention of subjecting the State's punishment case to adversarial testing.

The Supreme Court has identified only two circumstances under which a trial court may, consistent with the Sixth Amendment, refuse to honor a competent defendant's claimed right of self-representation. A court may do so when, in the court's estimation, the defendant suffers from such

"severe mental illness" that, while competent to stand trial, he nevertheless lacks the capacity to defend himself without a lawyer. *See Edwards*, 554 U.S. at 178. And it may do so when the defendant "deliberately engages in serious and obstructionist misconduct." *Faretta*, 422 U.S. at 834 n.46. In effect, Appellant asks us to add a third, nondiscretionary circumstance to this list: A trial court must deny a competent defendant his asserted right of self-representation if the defendant refuses to defend himself against the State's efforts to execute him.

Appellant primarily invokes the Eighth Amendment principle that in capital cases there is a heightened "need for reliability in the determination that death is the appropriate punishment." *See, e.g.*, *Woodson v. North Carolina*, 482 U.S. 280, 305 (1976) (plurality op.); *see also Morris v. State*, 940 S.W.2d 610, 615 (Tex. Crim. App. 1996). The Supreme Court has acknowledged that self-representation can sometimes increase the likelihood of "an improper conviction or sentence." *See Edwards*, 554 U.S. at 176; *see also Faretta*, 422 U.S. at 834–35. But, even taking that increased likelihood into account, the Court has held that a lack of mental capacity to represent oneself presents an "exceptional context" uniquely justifying a discretionary limitation on the Sixth Amendment right of self-representation. *Edwards*, 554 U.S. at 176–77. In this case, the trial court determined that Appellant "ha[d] the mental ability to exercise" his right of self-representation. Absent the "exceptional context" of mental incapacity, we cannot agree that the heightened need for reliability in capital cases overrode the trial court's obligation to honor Appellant's right of self-representation.

Appellant also invokes the Eighth Amendment requirement, articulated in *Lockett v. Ohio*, that no death sentence be imposed without an "individualized consideration of mitigating factors." *See Lockett v. Ohio*, 438 U.S. 586, 606 (1978). But by allowing Appellant to represent himself in

the punishment phase, the trial court did not deny Appellant any of the mechanisms designed to facilitate an individualized sentencing based on the jury's consideration of mitigating factors. Appellant competently and deliberately declined to avail himself of those mechanisms. We have previously observed, albeit in an unpublished opinion, that *Lockett* does not compel the conclusion "that a capital-murder defendant *must* present mitigating evidence." *See Shore v. State*, No. AP-75,049, slip op. at 11 (Tex. Crim. App. Dec. 12, 2007) (not designated for publication) (citing *Lockett*, 438 U.S. at 586); *see also Shore v. Davis*, 845 F.3d 627, 632 (5th Cir. 2017) (observing that the petitioner had "waived" his Eighth Amendment right to present mitigation evidence "by instructing trial counsel not to argue against the death penalty."). Although we made this observation in an unpublished opinion, our understanding of *Lockett* has not changed. We disagree with Appellant that the need for an "individualized consideration of mitigating factors" in capital cases compels a nondiscretionary exception to the right of self-representation.

The trial court did not violate the Eighth Amendment by allowing Appellant to represent himself at the punishment phase of trial. Point of error fifteen is overruled.

**B. Appellant has not shown that the execution of "non-triggermen" is categorically cruel and unusual.**

In point of error nineteen, Appellant claims that a national consensus has emerged against the execution of "non-triggermen," or those who, like Appellant, "participated in a felony that resulted in death . . . but did not actually kill." And because the contours of the Eighth Amendment are responsive to the "evolving standards of decency that mark the progress of a maturing society," *see Atkins v. Virginia*, 536 U.S. 304, 312 (2002) (citations omitted), Appellant contends that this emergent consensus categorically bars his execution. Appellant asks us to deviate from the United

States Supreme Court's holding in *Tison v. Arizona*, 481 U.S. 137, 155 (1987), that, at least as of 1987, no such consensus had yet emerged.

In deciding whether the Eighth Amendment categorically prohibits a particular punishment, the Supreme Court has taken the following approach:

> The Court first considers objective indicia of society's standards, as expressed in legislative enactments and state practice, to determine whether there is a national consensus against the sentencing practice at issue. Next, guided by the standards elaborated by controlling precedents and by the Court's own understanding and interpretation of the Eighth Amendment's text, history, meaning, and purpose, the Court must determine in the exercise of its own independent judgment whether the punishment in question violates the Constitution.

*Graham v. Florida*, 560 U.S. 48, 61 (2010) (internal quotation marks and citations omitted). The second prong of this rubric is primarily concerned with (1) "the culpability of the offenders at issue in light of their crimes and characteristics, along with the severity of the punishment in question;" and (2) "whether the challenged sentencing practice serves legitimate penological goals." *Id.* at 67.

Appellant concedes at the outset of this point of error that this Court "lacks the authority to overrule Supreme Court precedent that currently interprets the federal constitution as allowing a death sentence for [those] who did not directly take a human life." He says that he raises this claim only so that he can "preserve it for further review by the Supreme Court. Appellant has failed to carry his burden to show that in light of the Eighth Amendment's "text, history, meaning, and purpose," administering the death penalty in cases such as Appellant's is categorically cruel and unusual. *See id.* at 61.

Appellant argues that the relatively meager number of death sentences assessed and carried out against non-triggermen in the years since *Tison* has "fail[ed] to produce a constitutionally sufficient retributive or deterrent effect." He does not elaborate, explain, or cite to binding Supreme

Court precedent to clarify what a "constitutionally sufficient retributive or deterrent effect" might look like. Further, he fails to explain how the Eighth Amendment's "text, history, meaning, and purpose" supports his argument. *See Graham*, 560 U.S. at 61 (citations omitted). Finally, Appellant's assertion that he personally was only indirectly responsible for Canfield's death is inapposite to whether the Eighth Amendment categorically prohibits the execution of parties to capital murder who did not actually kill. Point of error nineteen is overruled.

### C. We decline to undertake a "comparative proportionality" analysis.

In point of error twenty, Appellant argues that his death sentence is "comparatively disproportionate to sentences imposed in similar or even substantially more aggravated capital cases." Appellant acknowledges that, in *Pulley v. Harris*, the Supreme Court rejected the notion that "the Eighth Amendment, applicable to the States through the Fourteenth Amendment, requires a state appellate court, before it affirms a death sentence, to compare the sentence in the case before it with the penalties imposed in similar cases if requested to do so by the prisoner." 465 U.S. 37, 43–44 (1984). Indeed, the Court described a comparative analysis of the kind that Appellant requests as "constitutionally superfluous." *See id.* at 49. Nevertheless, Appellant argues that nothing in *Pulley* expressly precludes a state court from undertaking a comparative proportionality analysis, and he invites us to do so.

We see no reason to go beyond the Supreme Court's holding in *Pulley*. *See East v. State*, 702 S.W.2d 606, 617 (Tex. Crim. App. 1985). We have declined to do so in previous cases. *See, e.g.*, *Pondexter v. State*, 942 S.W.2d 577, 588 (Tex. Crim. App. 1996); *Morris*, 940 S.W.2d at 615–16; *East*, 702 S.W.2d at 616–17. Appellant fails to distinguish his case from our precedent rejecting the call to take a comparative proportionality review. Point of error twenty is overruled.

## X. CONCLUSION

We affirm the trial court's judgment of conviction and sentence of death.

Delivered: May 19, 2021

Do Not Publish